UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

AMY YOUNG and JOHN SCOTT,
as Co-Personal Representatives of          CASE NO.: 5:13-CV-113-OC-22-PRL
the ESTATE of ANDREW LEE SCOTT,
deceased, and MIRANDA MAUCK,
Individually,

Plaintiffs,

vs.

GARY S. BORDERS, in his official capacity
as SHERIFF of LAKE COUNTY FLORIDA,
and RICHARD SYLVESTER, in his
individual capacity,

Defendants.
_____/

## NOTICE OF FILING DEPOSITION TRANSCRIPT OF KRIS LEE SPERRY, M.D. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, the Plaintiffs, AMY YOUNG and JOHN SCOTT, as Co-Personal

Representatives of the Estate of ANDREW LEE SCOTT, deceased, and MIRANDA

MAUCK, individually, and hereby gives notice of filing the attached Deposition

transcript of Kris Lee Sperry in support of Plaintiffs Motion for Summary Judgment, for

use at the Trial of this matter or for any other just purpose this Court deems proper.

## CERTIFICATE OF SERVICE

I HERBY CERTIFY that a true and correct copy of the foregoing was filed with

the Court using the CM/ECF system and via electronic mail to John M. Green, Jr., Esq. at

lwinchenbach@me.com; jmgjr@mac.com; and gingerroy@me.com, on this 1st day of

May, 2014.


**__/s/ Jason J. Recksiedler, Esquire__**
**Jason J. Recksiedler, Esquire**
Florida Bar No. 092060
**Mark E. NeJame, Esquire**
Florida Bar No. 310931
**Stephen L. Calvacca, Esquire**
Florida Bar No. 561495
NeJame Law
189 S. Orange Avenue, Suite 1800
Orlando, FL  32801
Telephone: 407-245-1232
Facsimile:  407-802-1445
Attorneys for Plaintiff
jason@nejamelaw.com
sara@nejamelaw.com

1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                           OCALA DIVISION

3

   AMY YOUNG and JOHN SCOTT,
4  as Co-Personal
   Representatives of the
5  ESTATE of ANDREW LEE          CASE NO.:
   SCOTT, deceased, and
6  MIRANDA MAUCK,                5:13-CV-113-OC-22-
   Individually,                 PRL
7
            Plaintiffs,
8
        vs.
9
   GARY S. BORDERS, in his
10 official capacity as
   SHERIFF of LAKE COUNTY
11 FLORIDA, and RICHARD
   SYLVESTER, in his
12 individually capacity,

13          Defendants.
   ~~~~~~~~~~~~~~~~~~~~~~~~
14

15

16                      DEPOSITION OF

17                  KRIS LEE SPERRY, M.D.

18                     April 10, 2014
                         1:01 p.m.
19
           101 Marietta Street, Suite 2700
20                    Atlanta, Georgia

21

22     Deborah P. Longoria, CCR B-1557, RPR

23

24

25



```
 1                        APPEARANCES

 2   On behalf of the Plaintiffs:
         NEJAME, LAFAY, JANCHA, AHMED, BARKER, JOSHI &
 3       MORENO, P.A.
         JASON J. RECKSIEDLER, ESQ.
 4       189 South Orange Avenue
         Suite 1800
 5       Orlando, Florida  32801
         407.245.1232
 6       Jason@nejamelaw.com

 7   On behalf of the Defendants:
         JOHN M. GREEN, JR., P.A.
 8       JOHN M. GREEN, JR., ESQ.
         125 NE 1st Avenue
 9       Suite 2
         Ocala, Florida  34470
10       352.732.9252
         Jmgjr@mac.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                 INDEX TO EXAMINATIONS

 2   WITNESS:  Kris Lee Sperry, M.D.

 3

 4                                                Page

 5   Examination by Mr. Recksiedler                  4

 6   Examination by Mr. Green                       46

 7   Further Examination by Mr. Recksiedler         47

 8

 9

10                   INDEX TO EXHIBITS

11   Plaintiff's
        Exhibit           Description          Page
12

13       1     2/6/14 Initial Consultation Letter    7

14      (Original Exhibit 1 has been attached to the
     original transcript.  Disc was not marked but was
15   copied and a copy given to Mr. Recksiedler and to
     Mr. Green and the original given back to Dr. Sperry
16   and is not attached to the transcript.)

17

18

19

20

21

22

23

24

25
```



```
 1           Deposition of Kris Lee Sperry, M.D.

 2                      April 10, 2014

 3        (Reporter disclosure made pursuant to Article

 4   8.B. of the Rules and Regulations of the Board of

 5   Court Reporting of the Judicial Council of Georgia.)

 6                  KRIS LEE SPERRY, M.D.,

 7   having been first duly sworn or affirmed, testifies

 8   as follows:

 9                      EXAMINATION

10   BY MR. RECKSIEDLER:

11        Q.    Can I get you to state your full and

12   complete name for our court reporter, please.

13        A.    My name is Kris Lee Sperry.

14        Q.    And are you a licensed medical doctor?

15        A.    Oh, yes.

16        Q.    Dr. Sperry, we're here in Atlanta,

17   Georgia, today.  Can you tell us what it is that you

18   do for a living, please.

19        A.    I'm a forensic pathologist.  I'm the chief

20   medical examiner for the State of Georgia.

21        Q.    What is a forensic pathologist, please?

22        A.    A forensic pathologist is, first of all, a

23   specialist in pathology, which is the medical

24   specialty that deals with human disease and illness

25   and injury of basically millions of manifestations
```



 1 | these days, from unborn babies all the way to

 2 | centenarians.  And forensic pathology is a

 3 | subspecialty area that deals specifically with the

 4 | investigation of sudden, unexpected, undetermined,

 5 | violent, questionable or otherwise unknown deaths.

 6 |     Q.   And how long have you been a pathologist

 7 | in the state of Georgia?

 8 |     A.   Since nineteen -- December of 1989.

 9 |     Q.   Have you ever had your opinions stricken

10 | in federal court?

11 |     A.   No.

12 |     Q.   Have you ever had your opinions stricken

13 | in any court that you're aware of?

14 |     A.   Not that I'm aware of.

15 |     Q.   You are familiar with the deposition

16 | process?

17 |     A.   Oh, yes.

18 |     Q.   You have your deposition taken dozens of

19 | times per year?

20 |     A.   That's fair.  Yes.

21 |     Q.   You're also familiar with the trial

22 | process and appear in front of juries how many times

23 | a year on average?

24 |     A.   Oh, these days, probably ten to 12.  It's

25 | been as many as between, oh, almost 40 a year when I



 1   was younger and didn't have people under me that I

 2   could delegate things to.

 3        Q.    You are here today -- you're not here in

 4   your official capacity with the State of Georgia; is

 5   that correct?

 6        A.    That's correct.

 7        Q.    You're here because you were retained

 8   privately on behalf of Sheriff Gary Borders and the

 9   Lake County Sheriff's Office as well as Deputy

10   Richard Sylvester; is that accurate?

11        A.    Yes.

12        Q.    When were you first retained?

13        A.    I was first contacted in early February of

14   2014 and very short -- within a day or two after that

15   I received materials.

16        Q.    What were you asked to do in this case?

17        A.    I was asked to review all of the

18   information that I was provided with respect to the

19   shooting death of Mr. Scott and provide whatever

20   opinions I could in relationship to what caused his

21   death, which bullets caused his death; whether -- I

22   should say what positions, if at all possible, he was

23   in or might have been in at the time when various

24   bullets were discharged; and to determine, if at all

25   possible, the potential order in which -- of the



1  missiles that struck him.

2      Q.    I do notice in front of you that you do

3  have some paperwork; you have some correspondence

4  from Attorney John Green and his office, correct?

5      A.    Yes.

6      Q.    Was that the initial consultation letter

7  with your office with instructions?

8      A.    Well, yes.  There was no instructions.  It

9  was just the transmittal letter that outlined

10  everything that Mr. Green sent me, and that actually

11  comprises everything that I have.

12      Q.    Okay.  Can I just take a look at the

13  letter quick?  We're going to attach that letter --

14      A.    Absolutely.

15      Q.    -- as Plaintiff's Exhibit No 1 for

16  identification.

17          (Plaintiff's Exhibit-1 was marked for

18      identification.)

19      Q.    (By Mr. Recksiedler)  Fair to say that all

20  of the information on this correspondence is the

21  information that you've reviewed in relation to this

22  case?

23      A.    Yes.

24      Q.    Is there any additional information that

25  you have reviewed that is not present on the



1    correspondence of February 6th, 2014?

2         A.    No.

3              MR. GREEN:  I believe he has received a

4         copy of DiMaio's report, which I don't know is

5         listed on there.

6              MR. RECKSIEDLER:  It is listed.

7              THE WITNESS:  Yeah, it is on the disc as

8         well.  Is really what I received was the letter

9         and this disc.  And then everything that was on

10        the disc, I printed out, all the paper material,

11        that is, the documents.  I printed a number of

12        mostly the autopsy photographs and photographs

13        taken by the medical examiner's office.  I did

14        not print any of the scene photographs taken by

15        either FDLE or by the sheriff's office.

16        Q.    (By Mr. Recksiedler)  So the disc in front

17   of you, is that a copy of the disc or is that the

18   actual disc?

19        A.    This is the actual one that I was sent.

20        Q.    Okay.  You didn't happen to bring a copy

21   of it, did you?

22        A.    I didn't even think to make a copy of it.

23              THE WITNESS:  I think, you guys can copy

24        discs though, can't you?

25              COURT REPORTER:  Yes, sir.



1          MR. RECKSIEDLER:  Okay.  Then what I'll do

2     is we'll attach the disc.  What I would ask is

3     that a copy be attached, the original returned

4     back to Dr. Sperry, please.

5          (Discussion off the record.)

6     Q.    (By Mr. Recksiedler)  Okay.  So did you

7  have a separate conversation then with Attorney Green

8  on what was to be required of you in this case?

9     A.    Yes.

10    Q.    Was that by phone or e-mail?

11    A.    It was by phone.

12    Q.    How much time have you spent to date on

13  this case?

14    A.    Oh, my.  Probably altogether probably

15  between four and five hours.

16    Q.    Have you sent a bill --

17    A.    Yes.

18    Q.    -- for your services?

19    A.    I did.

20    Q.    Do you have a copy of that with you today?

21    A.    No.

22    Q.    Do you know how much that bill was?

23    A.    I think approximately 2,000 to $2,500.

24    Q.    You also prepared a report in this case,

25  correct?



1     A.    Yes.

2     Q.    Have you done any addendums to the report

3   at all?

4     A.    No.

5     Q.    And I have that report of February 27th,

6   2014.  That was the report that I was speaking of.

7   Fair enough?

8     A.    Yes.

9     Q.    All right.  You've come to certain

10  opinions in this case and we're going to discuss

11  those opinions.

12    A.    Okay.

13    Q.    First thing that I want to do is be able

14  to separate out those facts which are disputed facts

15  from those which are not disputed facts and then

16  learn of any assumptions that you've made in coming

17  to any of the conclusions or opinions that you have.

18          Easiest way for me to do this is to try to

19  address some of the facts that are not in dispute and

20  see whether you agree or disagree with that and then

21  we'll go from there.

22    A.    Sure.

23    Q.    Kind of giving you a roadmap here.  Okay,

24  Doc?

25    A.    Good.



1    Q.    All right.  In doing that, you agree that

2    six bullets were fired from Deputy Sylvester's

3    firearm?

4    A.    Yes.

5    Q.    You agree that three of those six entered

6    into the body of my client, Andrew Scott?

7    A.    Yes.

8    Q.    You agree that five of those six shots

9    made contact with the door of Apartment 114, which

10    was Andrew Scott's apartment?

11    A.    I thought it was four.  That was my

12    recollection, was that there were four that struck

13    the door.  Well, there were five bullet holes;

14    although there's No. 7 and I think No. 11 were

15    figured to be continuous with each other.

16          And there's -- and in one of the crime

17    scene -- at least, one of the crime scene individuals

18    were doing their analysis, they reached the

19    conclusion that there were four bullets that struck

20    the door and that there were two that had entered the

21    apartment without striking anything.  So that at

22    least is my understanding.

23    Q.    Okay.  So let's step back.  Is your

24    opinion that four of the six bullets struck the door?

25    A.    Yes.



1    Q.    Okay.  Is it therefore your opinion that

2    two of the six did not strike the door in any way?

3    A.    Yes.

4    Q.    All right.  Do we agree that it was one or

5    more bullet, bullets, from Deputy Sylvester's firearm

6    which was the proximate cause of the death of Andrew

7    Scott?

8    A.    Yes.

9    Q.    You have formed a variety of opinions.  I

10   have, to the best of my ability, narrowed it down to

11   three primary opinions.  And I may be incorrect in

12   that; so if I am, feel free to contest that with me.

13        But I understand that you have three

14   primary opinions and those three opinions represent

15   three of the bullets that were shot from Deputy

16   Sylvester's firearm as to the location of those

17   bullets in Mr. Scott's body and his approximate

18   positioning as it related to Deputy Sylvester upon

19   the firing of the firearm.

20   A.    Okay.

21   Q.    All right?  So let's address it.  In

22   reviewing your report, I did get somewhat confused in

23   how you outlined the various shots that were fired

24   and their sequence.

25        Do you have an opinion with respect to the

1   sequence of each of the six shots that were fired?

2       A.    No.

3       Q.    Okay.  Would it be fair to say that you do

4   not know which -- where the first shot, where that

5   bullet landed?

6       A.    Correct.  I don't have an opinion as far

7   as, say, what the first shot was, you know, with

8   reference to various defects in the door and injuries

9   to Mr. Scott.

10      Q.    Okay.  So do you have any opinion as to

11  which of the six shots was the shot which first

12  struck Mr. Scott?

13      A.    Yes.

14      Q.    And can you tell me what that opinion is,

15  please.

16      A.    My opinion is that the first of the -- of

17  the three shots Mr. Scott sustained, the first one

18  was the shot that entered and exited the left side of

19  the abdomen.

20      Q.    And I do want to back up, because I think

21  that we've misunderstood each other, so I want to

22  clarify.

23           I understand that you cannot tell me which

24  of the six shots first struck Mr. Scott, correct?

25      A.    In sequence, whether -- and I think we're



1   communicating -- whether it was of the first one that

2   the deputy fired versus the third versus the fifth, I

3   mean, no, I cannot tell you that.  And I have no

4   opinions about the sequence of -- well, which of the

5   six shots in the order in which they were fired was,

6   say, the first one that struck Mr. Scott.

7        Q.    Fair enough.

8        A.    Is that what you're asking?

9        Q.    That was exactly what I was asking.  So

10  now let's separate that out.

11            Are you able to form an opinion, and I

12  think this is what your answer was getting to, form

13  an opinion as to which of the first of the three

14  shots which struck Mr. Scott, where that shot would

15  have struck him?

16       A.    Okay.  Yes.  Of the three shots that

17  struck Mr. Scott, my opinion, the first one was the

18  one that struck him in the left side of the abdomen

19  and exited from the left back of the abdomen.

20       Q.    Okay.  This is very difficult to do on a

21  transcript.  Can you give me a physical description

22  of where the shot entered Mr. Scott's left-sided

23  abdomen?

24       A.    Sure.  And I think the most accurate way

25  or the easiest way actually is from the autopsy



1    report that Dr. Lavezzi performed because she

2    actually made the measurements to specifically locate

3    on Mr. Scott's body where various injuries were

4    located.

5             So that entrance wound is on Page 4 of her

6    autopsy.  And she describes it as being on the

7    lateral left abdomen, 24 inches beneath the top of

8    the head and 13 inches to the left of the anterior

9    midline.

10       Q.   Okay.  And did she also identify where it

11   had exited?

12       A.   Yes.  She identified the exit as being on

13   the lateral left back, 23-3/4 inches beneath the top

14   of the head and 5-1/2 inches to the left of the

15   anterior midline.

16            MR. GREEN:  You want to use that for a

17       visual (indicating)?

18            MR. RECKSIEDLER:  Actually it might help.

19       Q.   (By Mr. Recksiedler)  Now, why is it that

20   you are opining that that is where the first shot

21   that struck Mr. Scott, that that is the location of

22   where it struck him?

23       A.   Okay.  And I'll go through this, and I'm

24   sure we'll kind of break it down, but there's some

25   complexity to it.



1       First of all, this places, that is, this

2  gunshot wound, places Mr. Scott essentially facing

3  the shooter.  Maybe -- and, you know, Detective

4  Sylvester.  And like I said, I have no -- I've

5  accepted that.  I'm just bad with names.  And

6  typically when I'm talking about things, I talk about

7  the victim and the shooter.

8       MR. GREEN:  Just use Deputy Sylvester.

9       THE WITNESS:  Yeah, the Deputy Sylvester.

10      So because of the orientation of the wound at

11      that particular time, at that instant when that

12      wound was sustained, Mr. Scott was facing Deputy

13      Sylvester with possibly a very slight -- with

14      his body slightly turned to the right, but it's

15      very, very slight, if any.  Because the

16      orientation of the wound or, that is, the

17      location from the midline on the front of the

18      body is, well, it's 13-3/4 inches to the left of

19      the midline, so there is actually some rightward

20      deviation, because on the back it's 5-1/2 inches

21      to the left of the midline.

22      And if -- I mean, to stand here and show

23      you, with the entrance located approximately

24      where my hand is, with his body turned slightly

25      to the right, that would create a pathway



1          through his body with the exit being more

2          associated or closer to the side than to the

3          midline.  If he were turned the other way, that

4          is, the exit would be more towards the right.

5          Does that make sense?

6          Q.    (By Mr. Recksiedler)  It does.

7          A.    So Mr. Scott's body is turned slightly to

8     the right at that instant.

9               Secondly, the features of the wound, and

10    looking specifically at Dr. Lavezzi's report, she

11    describes the entrance wound as measuring 1 by

12    one-half inch -- it was a 1 by one-half inch oval

13    defect with a 1/16th to 1/8th inch marginal abrasion.

14              And the -- I know I'm jumping ahead but in

15    order to make this clear, it's necessary.

16              An opinion I have, which I know we'll talk

17    about, is that the wound that entered Mr. Scott's

18    left arm on the upper outer side exited from his arm

19    and then struck his chest, that this entrance wound

20    was from a bullet that had not struck anything prior

21    to striking him.  In other words, there was no graze,

22    there was no -- off of anything else; there was no

23    intermediate surface that it had passed through.  It

24    was -- it had gone straight from the muzzle of the

25    deputy's weapon into his left upper arm.



1           And just for reference purposes,

2    Dr. Lavezzi measured this entrance wound as being --

3    on the left upper arm as measuring one-quarter by

4    one-half inch, which is significantly smaller than

5    the entrance wound on the left side of the abdomen

6    which was measured at 1 by one-half inch.

7           And the difference in the characteristics,

8    the measurements as well as there are visual

9    characteristics looking at the exit wound and the

10   reentrance wound from the arm and chest gunshot

11   wound, shows a very distinct similarity.  And the

12   point I'm getting at is that the wound on the left

13   side of the abdomen, the entrance wound, appears to

14   be from a bullet that is slightly deformed or is not

15   perfectly cylindrical as it would be coming out of

16   the weapon and, in my opinion, had struck something

17   prior to striking Mr. Scott.

18          And in looking at the -- we spoke earlier

19   about the door and what defects there were.  There is

20   a specific defect that has been designated in the

21   various photographs in evidence as Defect No. 9,

22   which appears to be a graze.  Dr. DiMaio also refers

23   to that in his report, that there was no bullet that

24   was recovered in the door that accounted for that and

25   there was not a through-and-through perforation of



1   the door from No. 9.

2           This grazing defect of the door would

3   account for deformity of the bullet.  After it struck

4   the door, it would change its trajectory somewhat or

5   change its characteristics and cause it to start to

6   mushroom or be distorted.  And as such, when the

7   bullet, after having struck the door and becoming

8   deformed to some extent, when it struck an individual

9   or struck Mr. Scott, the entrance wound would be

10  somewhat atypical as compared with the wound on the

11  left upper shoulder, which, as I said earlier, does

12  not appear to have been from a bullet that struck

13  anything else prior to striking him.

14          So in other words, to sum it up, my

15  opinion, the entrance wound on the left side of

16  Mr. Scott's abdomen represents an entrance wound from

17  a bullet that has been deformed and is thus increased

18  in diameter, as the missiles, as the projectiles are

19  clearly designed to do that the deputy was carrying,

20  and as such, caused an enlarged atypical wound on his

21  abdomen.  And the only defect -- the only place

22  actually that accounts for a missile striking and

23  deforming is the defect on the door that's been

24  designated as No. 9 as a graze defect.

25          So stringing all that together, my



 1    opinion, the missile that struck Mr. Scott in his

 2    abdomen, which in my opinion also is the first in the

 3    sequence of the three missiles that struck him,

 4    glanced off the door and changed its characteristics

 5    and it began to mushroom and deform, struck him in

 6    the abdomen, then exited from the back and then

 7    continued on.

 8          Q.    Okay.

 9          A.    So did you follow that?

10          Q.    I did.

11          A.    Good.

12          Q.    So now I'm going to break that down a

13    little bit because I like things in shot-glass

14    size --

15          A.    Oh, no, no.

16          Q.    -- compared to the tall size, but I

17    appreciate the answer.

18          A.    Well, the hardest part for something like

19    this is to, like I said, take something that has

20    multiple features and present it in such a way that

21    you understand what I'm saying, and that's the only

22    goal that I have, that you understand what I'm

23    saying.

24          Q.    Okay.  So let's break it down.  Basically

25    what you've just said is the first missile to strike



1    Mr. Scott also hit the door?

2         A.    Yes.

3         Q.    And in order for it to hit the door, that

4    means Mr. Scott had to be standing behind the door to

5    a certain degree within his own premises; isn't that

6    true?

7         A.    Yes.  Part of his body, you know, to the

8    right actually basically of where this missile

9    entered, some portion of his body would be behind the

10   door, the edge of the door, yes.

11        Q.    Similarly, we don't know whether at the

12   time that that missile struck the door, the door was

13   opening or whether it was closing, do we?

14        A.    No.

15        Q.    So we don't know whether Mr. Scott was

16   advancing, nor do we know from just the facts that

17   you've outlined whether he was retreating at the

18   time, do we?

19        A.    Correct.

20        Q.    More likely than not, though, he would not

21   have been advancing if the bullet had struck the

22   door; isn't that true?  Let me -- you're pausing.

23        A.    Yeah.  I'm not sure why that would be.

24        Q.    Well, we know that two objects can't

25   occupy the same space at the same time, true?



 1        A.    Yes.

 2        Q.    We know that the door was in front of

 3   Mr. Scott, true?

 4        A.    Yes.  The door was partially in front and

 5   then, you know, with him facing almost on edge.

 6        Q.    Okay.  Now, I want to be able to

 7   understand the sequence that occurred, in your

 8   opinion, before that shot was fired that we just

 9   spoke about.  We're talking about the first missile

10   to strike Mr. Scott, correct?

11        A.    Yes.

12        Q.    Okay.  So let's talk about the sequence of

13   events that may have occurred before then, in your

14   opinions, with respect to that.  Okay?

15        A.    Okay.

16        Q.    And then we'll get to the rest of it

17   later.

18        A.    Okay.

19        Q.    Just so that we understand each other.

20              Your opinion is, based upon the fact that

21   Mr. Scott's body is turned toward an angle consistent

22   with Deputy Sylvester indicated that he was located,

23   that he was facing Deputy Sylvester, true?

24        A.    Yes.

25        Q.    There is no evidence or testimony in this



 1   case that you've read or observed that Mr. Scott knew

 2   that Deputy Sylvester was standing to the right of

 3   his doorway, is there?

 4        A.    That's correct.  I know of none.

 5        Q.    Okay.  So is there any opinion that you

 6   have with respect to the degree that the door was

 7   opened at the time that Mr. Scott opened the door as

 8   a result of Deputy Sylvester's knock?

 9        A.    Only -- no.  I cannot give a better

10   opinion to that, only to the extent that, well,

11   depending on how much or -- how much the door is

12   open, Mr. Scott would have to be in the same

13   essential association with the edge of the door at

14   the time the missile was shot, whether it was only

15   open a few inches or whether it was open a much

16   greater distance, because he still would be in the

17   same orientation with his body with respect to the

18   door when the missile was fired.

19        Q.    And again, we don't know whether this was

20   the first missile filed or some subsequent missile

21   fired from Deputy Sylvester, correct?

22        A.    Correct.

23        Q.    And we don't know whether Mr. Scott was

24   retreating as a results of a prior missile being

25   fired, do we?



1        A.     No, we do not.

2        Q.     You also opine that Mr. Scott was -- had

3    his arm extended and pointing a weapon in Deputy

4    Sylvester's face; is that correct?

5        A.     Well, his arm was extended with the

6    weapon.  And I think what I said in my report is that

7    in my opinion that the statement of Deputy Sylvester

8    that Mr. Scott was pointing the weapon in his face,

9    and, that is, in the deputy's face, is consistent.

10            I've not said that he was, you know, and

11   that's not something I think can be said to a

12   reasonable degree of medical certainty.  But I

13   believe that Mr. Scott had the weapon and had it in

14   his hand and it was extended to some extent.

15            The interpretation that Deputy Sylvester

16   had of the sequence or of the event as it was

17   happening, that's his interpretation.  And I don't

18   have an opinion as to whether or not his

19   interpretation is completely accurate or not.  It's

20   consistent, as I said.

21       Q.     Okay.  Again talking about facts not in

22   dispute, Deputy Sylvester in his deposition testified

23   that he never saw Mr. Scott's face.  Do you recall

24   that testimony?

25       A.     I recall that, at least that statement,



1   you know, in his interview as that.  I understand

2   that to be what he has said.

3       Q.    Okay.  You've also opined that there is no

4   evidence that this was in essence a close-range

5   shooting, if I understood that correctly?

6       A.    Yes.  There's no evidence of soot

7   deposition or stippling on Mr. Scott's body that

8   would be indicative of relatively close-range firing.

9       Q.    Let's talk about that.  What -- and you've

10  done this for how many years, Doctor?

11      A.    A long time.  30 some.

12      Q.    What distance are we talking about where

13  you would anticipate to see some of the powder or

14  stippling to show a close range?

15      A.    I understand.  And this is the same thing

16  that I tell juries when there isn't a weapon that can

17  be examined or it hasn't been done.  The only way to

18  actually determine the distance which smoke deposited

19  as soot or stippling, which are particles of burned

20  or unburned gunpowder, will travel is to reduplicate

21  or to perform testing with the same weapon and the

22  exact same ammunition.

23           So with that understanding, that the only

24  way to know, you know, to determine specific numbers

25  and distances is to do such testing.  You know, in



1   the absence of that, the majority of handguns of this

2   type will produce a puff of smoke that's deposited as

3   soot, oh, approximately maybe 7 to 12 inches perhaps.

4   There is variability and there's no way to know any

5   different, but that's an approximation based upon the

6   type of weapon.  And that particles of soot -- excuse

7   me, particles of gun powder, burned or unburned

8   gunpowder, will travel a greater distance before they

9   lose their momentum and do not cause any kind of

10  discernible change or injury if they strike a human

11  being.  And for that, again, for the majority of

12  handguns of this type, we're talking about perhaps 18

13  to 24 inches, in that range.

14        So, you know, those would be the numbers I

15  would give as approximations, but I would defer to

16  specific testing, if it were ever done, of the weapon

17  and of the same ammunition.

18      Q.   Would I be safe then to assume that this

19  firing of the weapon, whether it was the missile that

20  struck him or otherwise, that it would have required

21  18 inches or more from the hand of Mr. Scott?

22      A.   Yeah.  Yes.  For a distance from -- I

23  understand what you're asking -- from the muzzle of

24  the deputy's firearm to the hand, at least, which is

25  the first presenting part of Mr. Scott, and, of



1   course, more or less aimed towards that direction,

2   but that at least would be the approximate distance

3   that stippling could be identified.

4           MR. RECKSIEDLER:  Do you need to take

5       that, Doctor?

6           THE WITNESS:  No.  I don't know who it is.

7           (Discussion off the record.)

8           THE WITNESS:  All right.  Thanks.  Sorry

9       about that.

10      Q.    (By Mr. Recksiedler)  Not a problem.  I

11  want to make sure that I've allowed you to finish

12  your answer, and I know that may have disrupted your

13  train of thought.

14          Again, my question was -- and I think you

15  understood it and I think you answered it.  And the

16  question was:  That would require a minimum of

17  18 inches between the muzzle of the gun that Deputy

18  Sylvester was firing and the extremity closest to

19  him, or the left hand, in your opinion, of Mr. Scott

20  at the time of any firing of the weapon?

21      A.    As a reasonable approximation, yes.

22      Q.    And that would have been the minimum

23  amount, correct?

24      A.    Correct.

25      Q.    Okay.  Let's keep talking then about what



 1   would have occurred beforehand, before the first

 2   missile struck Mr. Scott, in your opinion.

 3          Do we know whether and do you have any

 4   opinion whether the first missile bullet that was

 5   fired from Deputy Sylvester's weapon struck the door

 6   or was one of the two that would have not struck the

 7   door at all?

 8       A.   Okay.  Ask me that again.

 9       Q.   Yes, sir.  We've already established the

10   following:  We've established we don't know which

11   number of the six was the missile to strike

12   Mr. Scott?

13       A.   Oh, okay.

14       Q.   We've established that four of the six

15   bullets, missiles, struck the door in some capacity?

16       A.   Yes.

17       Q.   We've also established that two of the six

18   did not appear to strike the door at all --

19       A.   Correct.

20       Q.   -- correct?  All right.  So I guess my

21   next question is:  If I understood your earlier

22   testimony, your earlier testimony was the bullet to

23   strike the left arm of Mr. Scott would not have made

24   impact with any other object?

25       A.   Correct.



1        Q.      Okay.   So we know therefore that and it is

2    your opinion that the bullet, missile, that struck

3    the left arm of Mr. Scott was not the first missile

4    to strike Mr. Scott, correct?

5        A.      Correct.

6        Q.      So we now have it narrowed down to there

7    are only two possibilities for bullets that did not

8    strike the door, correct?

9        A.      Yes.

10        Q.      And one of those bullets struck Mr. Scott,

11    correct?

12        A.      Yes.

13        Q.      And one did not?

14        A.      Yes.   Correct.

15        Q.      Do you have any opinion as to whether the

16    first missile fired struck the door or struck

17    Mr. Scott or struck nothing at all?

18        A.      You mean the first of the six?

19        Q.      The first of the six, yes, sir.

20        A.      No, no.   I don't think there is a way to

21    know that.

22        Q.      All right.   Deputy Sylvester testified

23    that he was looking down the muzzle of the gun that

24    Mr. Scott was holding to the extent that he could see

25    the rifling and discoloration in the barrel.



1          From a medical standpoint, knowing that

2   the weapon in his hand had to be a minimum of

3   18 inches away, given the fact that there is light

4   behind Mr. Scott and no light behind Deputy

5   Sylvester, is that plausible in your opinion?

6          A.    No.   That does -- that does not make sense

7   because of exactly what you're saying and just the

8   difficulty, frankly, of seeing rifling, much less any

9   discoloration, I'm not even sure what that means, but

10  seeing rifling going down the muzzle of a weapon is

11  very difficult to do unless one has good light and

12  also the breach is open so that light is going

13  through and -- or unless, of course, you have a

14  flashlight which was looking down the muzzle of the

15  weapon.   As you have -- you know, as the deputy has

16  testified, I do not find that statement to be

17  plausible.

18         Q.    Okay.   Let's talk then, the first missile

19  that struck Mr. Scott, we have no way of knowing

20  where his left arm was just on the basis of that in

21  isolation, do we?

22         A.    Well, to a degree we do.   Because it would

23  -- because the bullet struck him on the abdomen, what

24  that means is that at that point in time, his left

25  arm was nowhere in the vicinity of the abdomen so



1   that the bullet would have struck his arm first.  It

2   would have been, you know, most probably raised out

3   of the way in some way.

4        Q.    Okay.  So we can draw the conclusion that

5   the left arm was certainly not blocking the abdomen

6   where the bullet struck, correct?

7        A.    Yes.

8        Q.    But we can't say that it was raised in a

9   surrender position, can we?

10       A.    No.

11       Q.    We can't say that it was pointing out

12  directly in front of him in a pointed direction such

13  as Deputy Sylvester has testified, can we?

14       A.    No.  No, we cannot.  I was about to say

15  correct but you switched over.

16       Q.    Yeah, yeah.

17       A.    No.  All that can be said is that his arm

18  was away from the abdomen when that wound was

19  sustained, after, of course, striking the door.  But

20  exactly where his arm was is not something that can

21  be forensic pathologically determined.

22       Q.    Fair enough.  All right.  So now let's

23  talk about the second missile that you believe that

24  struck Mr. Scott.  And if I understood your testimony

25  earlier, you believe that the second missile that



1  struck Mr. Scott was the missile that struck him in

2  the left arm; is that correct?

3        A.    Yes.

4        Q.    Now, can you tell whether Mr. Scott

5  changed his physical position as it related to Deputy

6  Sylvester at the time that he received the second

7  shot?

8        A.    Yes.

9        Q.    And how do we tell that?

10       A.    We tell that by the trajectory of the

11 missile through the arm and into the chest.  And, you

12 know, to really the first part of positioning

13 Mr. Scott with relationship to the deputy is I would

14 say the forensic pathology conclusion that the wound

15 that entered the outer part of the left arm that

16 exited from the inner part also reentered the left

17 front of the chest, which would place his -- we call

18 this an entrance, an exit, and a reentrance.  And in

19 that sequence, this would place Mr. Scott's upper arm

20 somewhat raised and perhaps touching or at least more

21 or less in front of -- in close proximity is a good

22 way to put it -- either touching or in close

23 proximity to his left chest at the time that the

24 missile struck him.

25             Also, the trajectory of the missile into



```
 1   his chest is very oblique across his body, which
 2   means that with, of course, Mr. Scott with his arm
 3   raised in proximity or against his chest, and I'm
 4   just going to stand but I'll try to describe this, he
 5   would be turned -- his body would be turned more to
 6   the right, to his right, with respect to Deputy
 7   Sylvester when the weapon was discharged.
 8        Q.    Okay.  And again, I'm going to just try
 9   and describe a little bit of what your body motions
10   were for the record for myself when I go back and
11   read this.
12        A.    Sure.
13        Q.    Would it be accurate for me to say that
14   Mr. Scott's arm position during the time of the
15   second entry wound, in your opinion, would have been
16   in like a sling-like position that we've all seen
17   where an individual is wearing a sling with their arm
18   across their body?
19        A.    I don't have a problem with that.  That's
20   understandable.
21        Q.    And that's a fair way to summarize kind of
22   how your body was positioned?
23        A.    Yes.  I think, you know, someone would --
24   a layperson would understand what you and I were
25   trying to say with that kind of a description.
```



1      Q.    Thank you, sir.

2            Okay.  And in that point, where in your

3   opinion would Mr. Scott's hand be?

4      A.    His hand would be somewhere in the front

5   of his body but basically with the -- if he was

6   holding a weapon, it would be facing off to his right

7   somewhere, and it could be upwards or downwards.  I

8   mean there's a limit to this.  But it would be the

9   hand, like I said, assuming it's holding a weapon,

10  would be facing off to his right.

11     Q.    Would you agree with me then, sir, that

12  there is no way that the weapon at the time of the

13  second entry wound into Mr. Scott would have been

14  pointed at Deputy Sylvester?

15     A.    I agree.

16     Q.    Okay.  All right.  And then we come to the

17  third shot.

18     A.    Yes.

19     Q.    Is it your opinion that the third missile

20  to strike Mr. Scott struck him in the right arm, in

21  the rear of the arm?

22     A.    Yes.  The back of the right arm, yes.

23     Q.    And again I'm going to ask you if you

24  could please just explain the body position, assuming

25  that Deputy Sylvester did not move in this sequence



1    of shots, the body motion that you would have

2    anticipated for Mr. Scott to have been when he

3    received that third entry wound?

4         A.    Sure.  And this is -- the third wound of

5    the right arm is the most difficult of all of them to

6    place specifically just because the fact that it

7    entered the back of the right arm, and we know that

8    only two bullets entered into the dwelling without

9    striking or going through the door; and also,

10   secondly, that there were bullet fragments that were

11   found all over the place on the inside of the

12   dwelling, inside walls, in different holes.

13            And the bullet that was removed clearly

14   was not an intact bullet; that is, it had mushroomed

15   and the majority of the nose of the bullet with the

16   various petals that had mushroomed had sheared off

17   and probably -- and certainly comprised fragments

18   that were within the dwelling somewhere at different

19   places.  To my knowledge there was no analysis that

20   was attempted to try to match or correlate any of the

21   fragments with the bullet base that was found in the

22   back of Mr. Scott's right arm.

23            But what it does tell us, though, is

24   that -- well, because that is the base of the missile

25   with the jacket relatively intact, again, other than



1   the petals that had sheared off, that the bullet had

2   struck other things or who knows what the bullet had

3   struck prior and sheared off the different mushroom

4   petals before it finally struck him in the arm.

5            And as a consequence, it may have been a

6   bullet that, say, was one of the two that did not

7   strike him in the arm, that is, entered the dwelling

8   and then struck, ricochetted -- I don't think that

9   anyone knows -- but ultimately it ended up striking

10  him in the arm.

11           The bullet had lost much of its velocity

12  because it only penetrated through the arm and was

13  found underneath the skin, so it did not have a lot

14  of energy to it by the time it had struck him, struck

15  Mr. Scott.  But again, just from what I've said about

16  the missile and being the bullet base, I mean that

17  means by definition the bullet had struck other

18  things in between.

19           And the other potential option is that one

20  of the bullets that went through the door that --

21  although the crime scene officers did various

22  reconstructions and believed that, you know, with

23  strings and such they could identify the trajectories

24  of the missiles, the two missiles that went through

25  the door, I think that's open to some interpretation



 1   because the extensive fragmentation that went on with

 2   the bullets, all of the bullets except for the one

 3   that actually struck him in the left arm; that one

 4   was pristine, if you will, when it was recovered.

 5   Everything else was fragmented and broken in

 6   different places, which then means that the base of

 7   the bullet that struck Mr. Scott on the back of the

 8   right arm, at the time that that occurred, Mr. Scott

 9   may have been even facing away from the deputy at the

10   time when he sustained that wound.

11          There's a whole bunch of different

12   variables that I don't think ever will be resolved.

13      Q.   Okay.  And I think I heard certainly more

14   than one possibility.  I think I heard about three or

15   four possibilities of what you just said.

16      A.   Yes.

17      Q.   Would it be fair to say that you do not

18   have an opinion within a reasonable degree of medical

19   probability how the bullet entered the right rear of

20   Mr. Scott's arm?

21      A.   Or at least in the sense that where the

22   bullet went and what happened to it prior to it

23   entering his arm?  That would be correct, I do not

24   have an opinion about that.

25      Q.   So do you agree or disagree that more



1    likely than not Mr. Scott's body was turned at the

2    time that he received -- turned from Deputy Sylvester

3    at the time that he received the wound to his right

4    arm?

5         A.    I agree that more likely than not he was

6    turned away from Deputy Sylvester, only because

7    ricochets that -- ricocheted bullets that turn

8    90 degrees are very unusual.  They typically don't do

9    that and bounce.  And there's at least no place that

10   that I could tell from going at least through the

11   crime scene photographs and the descriptions that

12   described a, you know, say a steel plate or something

13   that would result in a very acute angle ricochet.

14         So I think more probably than not that

15   Mr. Scott was turned away, facing away more or less

16   from the deputy when he received that last gunshot

17   wound.

18        Q.    Again more likely than not this would have

19   been a bullet that's left its mark on the door as

20   well?

21        A.    Yes.  I think it is one of the bullets

22   that went through the door and, you know, as a

23   consequence, the interpretation, the ballistic

24   interpretation that has been done of where the two

25   bullets that did perforate the door, where they



1  passed and went is not accurate.

2      Q.    I'm going to deviate just a little bit

3  because when I started this, I tried to establish

4  certain facts with you and you brought something up

5  that kind of grabbed my attention.

6           What I'm asking you now is in relation to

7  the bullet that struck the door that in your opinion

8  made two -- at least two, markings on the door.  Do

9  you know what I'm talking about?

10     A.    Oh, you're talking about the whole 7 to 11

11 as they designate it?

12     Q.    Yeah.  Can you take me back through that?

13 Now, let's talk about that a little bit.

14     A.    Sure.

15     Q.    What you're saying is one of the shots

16 actually made two entrances into the door itself?

17     A.    Well, actually Dr. DiMaio summarized it

18 very nicely.  This is from Page 3 of his report.

19 This is -- he extracted this from the crime scene --

20 the analysis of the crime scene people when they

21 looked at the door.

22           Bullet hole No. 7 -- I'm quoting.  Quote:

23 Bullet hole No. 7 was on the left side of the outer

24 door jamb 40 inches above the ground.  The bullet did

25 not penetrate into the residence but went from left



1  to right -- that's on the door -- creating bullet

2  hole No. 11 in the door.  This bullet hole is

3  associated with a bullet on the interior of the door

4  42 inches above the ground.  Does that make sense?

5       Q.    Yeah.

6       A.    It struck the door jamb, then struck the

7  door itself and went in and actually was, as I recall

8  from the photographs, they actually peeled off the

9  end of the door, the cap on the door, and, in fact, I

10  think they said the bullet dropped out.

11      Q.    The bullet that we just spoke about, would

12  you agree that that bullet did not make contact with

13  Mr. Scott in any way?

14      A.    Correct.

15      Q.    Okay.  Did you take into account Deputy

16  Sylvester's height at all in coming to any of your

17  conclusions or opinions?

18      A.    No.

19      Q.    Did you take into account Mr. Scott's

20  height in coming to any of your conclusions or

21  opinions?

22      A.    No.

23      Q.    Did you take into account the height of

24  the step leading from Mr. Scott's house down to where

25  Deputy Sylvester was standing in coming to any of



1   your opinions?

2       A.   I took it into account only from the

3   perspective that the step really would create a

4   height differential that relatively explains the more

5   or less upward trajectory of the bullets that

6   transversed the door.  And that's -- I'd say that's

7   probably -- that is how I would say I accounted for

8   or at least acknowledged the fact that there was a

9   step, because it did create a height differential.

10      Q.   Were you able to consider at all the

11  degree to which the door was opened at any given

12  time?  For example, was the door opened, you know,

13  15 degrees during a certain sequence of shots,

14  30 degrees during a different sequence of shots?  Is

15  there any analysis that you did with relation to a

16  changing or differing degree of the door opening in

17  the sequence, however it may have occurred?

18      A.   Yeah.  I understand what you're asking.

19  And I did not attempt to do any kind of analysis on

20  that basis because I don't think -- you know, my

21  opinion, I think the situation -- well, the door was

22  not static, in fact, I would say in one particular

23  place.  In fact, I think at the very start you asked

24  me if I had any opinion of whether the door was in

25  the act of closing or act of opening, and I don't.



1          I think the nature of the event and the

2     way in general that these types of events play out

3     over a short period of time indicate that, although

4     there is certainly a relationship obviously between

5     the deputy and Mr. Scott, Mr. Scott's position is

6     somewhat changing during the course of things.

7                Pardon me.

8                (Discussion off the record.)

9                (The record was read by the reporter.)

10               THE WITNESS:  And that's what I was trying

11          to say is there are two particular points in the

12          sequence that are relatively fixed with

13          relationship -- with respect to Mr. Scott, the

14          deputy, and the door; and those are the two

15          where the gunshot wound of the abdomen is

16          sustained and the gunshot wound of the arm and

17          then, of course, I mean there are limitations to

18          those as well.

19          Q.   (By Mr. Recksiedler)  Uh-huh.  Okay.  I

20     think that we have talked about your three opinions

21     as they relate to the three missiles.  And I can keep

22     you here all day but if we've covered it, we've

23     covered it.

24               Is there something more that you'd like to

25     add about any of those three opinions as far as the



1   missiles entering Mr. Scott?

2       A.    No.  I mean realistically after all was

3   said and done, this really is relatively basic in

4   that sense.  I mean for me as a forensic pathologist

5   the questions are -- well, the issues are fairly

6   clear.  I mean I've dealt with similar ones many,

7   many times and those are -- and I've outlined to you

8   my opinions and the reasoning behind those opinions

9   and what I've been able to glean from the various

10  photographs and such.  I can't think of anything else

11  intelligent to tell you.

12      Q.    Well, good.  I appreciate that.  I really

13  do.

14           So I'm just going to go over one area a

15  little bit and make sure I understood it.  Again,

16  that first missile that entered, if I understand your

17  opinion, that opinion is that he would have been at

18  least in a direction facing Deputy Sylvester,

19  correct?

20      A.    Facing and turned with -- and Mr. Scott

21  turned slightly to his right, not at a 45-degree

22  angle, but I mean somewhere, and this is an

23  estimation, perhaps 10 to 15 degrees, just to put his

24  body position rotated enough to create the difference

25  from his side and the location between the entrance



1    and the exit wound.

2         Q.    Okay.  And the other opinion that you have

3    arrived at is basing it upon the assumption that

4    because he is standing at that angle and Deputy

5    Sylvester is where he is, that Deputy Sylvester is

6    consistent, if I understood correctly, with respect

7    to Mr. Scott's positioning?

8         A.    Yes.

9         Q.    All right.  I want to talk a little bit

10   about your trial history.

11        A.    Sure.

12        Q.    You have a number of cases in 2014.  One

13   of them is in Florida, Marion County, Florida.

14   What's that case about?  And you're representing the

15   defense in that case as well, correct?

16        A.    Oh, yeah.  That was tried in Tampa, wasn't

17   it?  Oh, is that --

18        Q.    It's on your --

19        A.    Let me see it, I can tell you.

20        Q.    This is Salvato versus Marion County

21   Sheriff's, et al., U.S. District Court of Ocala,

22   Middle District of Florida --

23        A.    Oh.  Yeah, that's a deposition.  That has

24   not yet gone to trial.  And I'm trying to think of

25   the specifics.  I cannot remember right now exactly



1   what the specifics are about that.

2       Q.    Fair enough.  But I do want to point out,

3   you are representing Marion County Sheriff's Office

4   in that case, correct?

5       A.    Yes, sir.

6       Q.    You also indicated there was a case that

7   you went to trial in Tampa.  Was that also involving

8   a police department or a law enforcement agency?

9       A.    Yeah.  It was involving a sheriff's

10  office.

11      Q.    And did you represent the sheriff's office

12  in that case as well?

13      A.    Yes.

14      Q.    In looking through your deposition and

15  trial experience, you also do testimony in cases

16  involving medical malpractice, is that --

17      A.    Oh, yes.  Yeah.  That's really the

18  majority of the type of cases that I've become

19  involved in as a consultant.

20           MR. RECKSIEDLER:  Okay.  I thank you, sir.

21      I don't have any further questions for you.

22           THE WITNESS:  Thank you.  It's been a

23      pleasure.

24  / / /

25  / / /



```
1                       EXAMINATION
2    BY MR. GREEN:
3         Q.    Dr. Sperry, just a couple of questions.
4    You were provided and read the sworn testimony of
5    Deputy Sylvester; is that correct?
6         A.    At least, well, his statements, I believe.
7    If you're -- I don't have his deposition.  I do not
8    -- I'm pretty sure I don't.  I don't have that here.
9         Q.    Okay.
10        A.    But at least --
11        Q.    Were his statements and observations as to
12   what transpired from the moment of the door opening
13   and until the last shot consistent with what your
14   observations and testimony were?
15             MR. RECKSIEDLER:  Objection, improper
16        bolstering.
17             THE WITNESS:  Yes.  I mean that's -- I
18        read those statements and in my opinion what he
19        was relating during those statements is
20        consistent with the opinions I've given today.
21        Q.    (By Mr. Green)  As to the first shot, are
22   your observations consistent with the fact that the
23   abdominal wound and shot occurred as Mr. Scott was
24   facing directly toward Deputy Sylvester, with his
25   left arm extended towards Sylvester and his body
```



1   partially shielded by the door?

2        A.    Yes, it would be consistent.

3        Q.    Okay.  Does the height of either Mr. Scott

4   or Deputy Sylvester affect the opinions and

5   conclusions that you have rendered?

6        A.    Not in this matter, no.

7             MR. GREEN:  Okay.  I have nothing further.

8                  FURTHER EXAMINATION

9   BY MR. RECKSIEDLER:

10       Q.    Always happens.  I have to follow up --

11       A.    Of course.

12       Q.    -- Doc.

13       A.    No problem.

14       Q.    You were asked specifically about the left

15  arm extended toward Deputy Sylvester during the time

16  of that first missile that struck Mr. Scott.

17            As I understood your testimony, we can't

18  say whether that arm was extended towards Deputy

19  Sylvester or whether it was extended up in the air

20  towards the ceiling, can we?

21       A.    Well, yeah, to -- yes, to a reasonable

22  degree of medical certainty, I agree with that.

23  That's what I agreed to.

24            MR. RECKSIEDLER:  Okay.  That's all I

25       have.  Thank you, sir.



 1          THE WITNESS:  You're welcome.

 2          MR. GREEN:  You want to read and sign?

 3          THE WITNESS:  I don't think so.

 4          (Deposition concluded at 2:03 p.m.)

 5          [Orders given to reporter as stated:  For

 6     Mr. Recksiedler, electronic and hard copy.  For

 7     Mr. Green, PDF and txt.]

 8          (It was stipulated and agreed by and

 9     between counsel and the witness that the

10     signature of the witness be waived.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                  C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5              I hereby certify that the foregoing

6         transcript was taken down, as stated in

7         the caption, and the questions and answers

8         thereto were reduced to typewriting under

9         my direction; that the foregoing pages 1

10        through 48 represent a true, complete, and

11        correct transcript of the evidence given

12        upon said hearing, and I further certify

13        that I am not of kin or counsel to the

14        parties in the case; am not in the regular

15        employ of counsel for any of said parties;

16        nor am I in anywise interested in the result

17        of said case.

18             This, the 16th day of April, 2014.

19

20

21             *Deborah P. Longoria*

22             DEBORAH P. LONGORIA, CCR B-1557, RPR

23

24

25



1                    COURT REPORTER DISCLOSURE

2

3          Pursuant to Article 8.b. of the Rules and
    Regulations of the Board of Court Reporting of the
    Judicial Council of Georgia which states: "Each court
4   reporter shall tender a disclosure form at the time
    of the taking of the deposition stating the
5   arrangements made for the reporting services of the
    certified court reporter, by the certified court
6   reporter, the court reporter's employer, or the
    referral source for the deposition, with any party to
7   the litigation, counsel to the parties or other
    entity.  Such form shall be attached to the
8   deposition transcript," I make the following
    disclosure:

9

10         I am a Georgia Certified Court Reporter.  I am
    here as a representative of Esquire Solutions.
    Esquire Solutions was contacted to provide court
11  reporting services for the deposition.  Esquire
    Solutions will not be taking this deposition under
12  any contract that is prohibited by O.C.G.A.
    9-11-28(c).

13

14         Esquire Solutions has no contract/agreement to
    provide reporting services with any party to the
    case, any counsel in the case, or any reporter or
15  reporting agency from whom a referral might have been
    made to cover this deposition.  Esquire Solutions
16  will charge its usual and customary rates to all
    parties in the case, and a financial discount will
17  not be given to any party to this litigation.

18

                    _Deborah P. Longoria_
19

20              DEBORAH P. LONGORIA, CCR B-1557, RPR

21

22

23

24

25

