UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

**AMY YOUNG, JOHN SCOTT and MIRANDA MAUCK,**

**Plaintiffs,**

**v.** **Case No: 5:13-cv-113-Oc-22PRL**

**GARY S. BORDERS, RICHARD SYLVESTER,**

**Defendants.**

___________________________________/

## ORDER

This cause comes before the Court for consideration of the following motions and responses:

1. Plaintiffs Amy Young and John Scott's (the "Personal Representatives"), co-personal representatives of Andrew Scott's estate, Motion for Partial Summary Judgment, filed on May 1, 2014 (Doc. No. 35);
2. Defendants Gary Borders ("Borders" or "Sheriff Borders") and Richard Sylvester's ("Sylvester" or "Deputy Sylvester") (collectively, "Defendants") Motion for Summary Judgment, filed on May 1, 2014 (Doc. No. 50);
3. The Personal Representatives and Plaintiff Miranda Mauck's ("Mauck") (collectively, "Plaintiffs") Response to Defendants' Motion for Summary Judgment, filed on May 15, 2014 (Doc. No. 52);
4. Defendants' Response to the Personal Representatives' Motion for Partial Summary Judgment, filed on May 28, 2014 (Doc. No. 53);

5. Defendants' Amended Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment, filed on May 28, 2014 (Doc. No. 55); and
6. The Personal Representatives' Reply to Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment, filed on June 11, 2014 (Doc. No. 58).

Plaintiffs filed this action against Deputy Sylvester, in his individual capacity, and Sheriff Borders, in his official capacity as Sheriff of Lake County, Florida. (Doc. No. 18). Plaintiffs assert the following claims in the Amended Complaint: Personal Representatives against Sylvester pursuant to 42 U.S.C. § 1983 (Count I); Personal Representatives against Borders pursuant to 42 U.S.C. § 1983 (Count II); Personal Representatives against Sylvester for wrongful death (Count III); Personal Representatives against Borders for wrongful death (Count IV); Mauck against Sylvester pursuant to 42 U.S.C. § 1983 (Count V); Mauck against Borders pursuant to 42 U.S.C. § 1983 (Count VI); Mauck against Sylvester for assault (Count VII); Mauck against Sylvester for false imprisonment (Count VIII); and Mauck against Borders for false imprisonment (Count IX). (*Id.* at pp. 8-28).

Plaintiffs, in their Motion for Partial Summary Judgment, appear to seek summary judgment only on Count II. (*See* Doc. No. 35 at p. 25). However, Plaintiffs later argue, through their Response to Defendants' Motion for Summary Judgment, that Mauck should be granted summary judgment on Count VI as well because it is "legally identical" to Count II. (Doc. No. 52 at p. 8 n.2). Defendants seek summary judgment on all Counts. (Doc. No. 50).[1]

On August 1, 2014, the Court held a hearing to address the pending motions for summary judgment. (*See* Doc. No. 68). For the reasons that follow, the Court denies the Personal

1 In Plaintiffs' Response to Defendants' Motion for Summary Judgment, Mauck indicates that she does not oppose Defendants' Motion for Summary Judgment as to Counts V, VII, VIII, and IX. (Doc. No. 52 at pp. 1-2). Summary judgment is therefore granted with respect to these Counts. Mauck's sole remaining claim in this case is Count VI against Sheriff Borders.

Representatives' Motion for Partial Summary Judgment and grants Defendants' Motion for Summary Judgment.

## I. BACKGROUND[2]

The facts giving rise to Plaintiffs' claims present a tragic story. As is oftentimes true, viewing present circumstances through the unforgiving lens of hindsight is unsettling because it is easy to focus on the innumerable and imaginary "what if" scenarios. This case is no exception; any number of events in this case could have gone differently, even however so slightly, which may have avoided the sad and unfortunate death of Andrew Scott. However, as discussed more fully below, the legal analysis is not so simple. Resolving the instinctive reaction to find fault with various of Defendants' actions, based solely on this case's tragic outcome, with formal constitutional requirements and rules of law is the subject of the remainder of this Order.

Early in the morning hours of July 15, 2012, Deputy Sylvester of the Lake County Sheriff's Office (the "LCSO") saw a motorcycle driving on State Road 441 "well in excess of the posted speed limit." (Richard Sylvester Dep. (Doc. No. 46) at 72:6-14).[3,4] Sylvester, who was on duty that evening working DUI detail, activated the emergency lights on his patrol car and initiated a pursuit of the motorcycle attempting to conduct a traffic stop. (*Id.*); (Richard Sylvester Aff. (Doc. No. 50-1) at ¶ 4). At some point during the pursuit, the motorcyclist turned left onto a county road and Sylvester lost sight of the speeding motorcycle. (Sylvester Dep. at 75:15-24).

---

2 Throughout this background section, the Court notes where the parties' versions of the facts conflict. Where the facts conflict, the Court interprets all facts in the light most favorable to the nonmoving party. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004).

3 All citations to deposition testimony in this Order refer to the page number appearing in the deposition transcripts.

4 Sylvester stated that he could not remember the exact speed of the motorcycle from his radar, but that "it was in the nineties . . . . 90 or 95 [miles per hour] is where [Sylvester] clocked him at." (Sylvester Dep. at 73:22-74:3). Sylvester's commander that evening testified that he believed Sylvester said that "he was behind a motorcycle . . . at 90 miles per hour." (Mark Stauffer Dep. (Doc. No. 45) at 54:6-18).

After Sylvester advised the Sheriff's Office dispatch that he had lost sight of the motorcycle, Lieutenant Mark Stauffer ("Stauffer"), the watch commander that evening, directed Sylvester to stop the pursuit. (Sylvester Aff. at ¶ 4); (Mark Stauffer Dep. (Doc. No. 45) at 54:6-55:1).

Shortly thereafter, Stauffer directed Sylvester to meet him at a local convenience store. (Stauffer Dep. at 57:3-13). Stauffer wanted to advise Sylvester as to why he decided Sylvester should cancel pursuit of the speeding motorcyclist. (*Id.*). At some point before arriving at the convenience store, Sylvester learned from the Sherriff's Office dispatch that the "motorcyclist might possibly be the same person being sought by the Leesburg Police Department and he might have a pistol." (Sylvester Aff. at ¶ 4); *see also* (Sylvester Dep. at 133:9-23). Sylvester drove to the convenience store and met with Stauffer. (Sylvester Dep. at 79:9-80:7). During Stauffer and Sylvester's meeting at the convenience store, another officer, Corporal David McDaniel ("McDaniel"), called and told Sylvester that he "had probably located the motorcycle at the Blueberry Hill apartments." (Sylvester Aff. at ¶ 5); *see also* (David McDaniel Aff. (Doc. No. 50-5) at ¶¶ 4-5).[5]

Sylvester left the convenience store and drove to the Blueberry Hill Apartments. (Sylvester Aff. at ¶ 5). Sylvester states that when he arrived he did not have his emergency lights on because "there was no need for them." (*Id.*). Once he arrived at the apartments, Sylvester positively identified the motorcycle as the one he had pursued earlier. (*Id.* at ¶ 6). Sylvester and the other officers present at the Blueberry Hill Apartments ran a vehicle record search and learned that Jonathon Brown owned the motorcycle. (Sylvester Aff. at ¶ 6); (McDaniel Aff. at ¶

5 McDaniel states that he heard Stauffer order Sylvester to terminate the motorcycle pursuit over the radio. (McDaniel Aff. at ¶ 3). Thereafter, McDaniel "continued on towards Leesburg and decided to check some places to make sure the motorcyclist had not wrecked somewhere." (*Id.*). McDaniel drove to "the Blueberry Hill apartment complex in Leesburg and noticed a motorcycle." (*Id.* at ¶ 4). McDaniel stopped his car, rolled down his window and heard the "motorcycle's motor still popping and crackling because it was hot." (*Id.*).

4); (Joseph Brocato Aff. (Doc. No. 50-6) at ¶ 6). The vehicle records search showed that Brown's registered address was in Mount Dora and not at the Blueberry Hill Apartments. (*Id.*). The search revealed that a white SUV parked next to the motorcycle was also registered to Brown. (*Id.*). At this point, the following officers were present at the apartment complex: Sylvester, McDaniel, Deputy Lisa Dorrier ("Dorrier"), and Deputy Joseph Brocato ("Brocato"). (Lisa Dorrier Aff. (Doc. No. 50-4) at ¶ 4).

Before Stauffer called off Sylvester's motorcycle pursuit, and prior to arriving at the Blueberry Hill Apartments, Brocato heard over the Leesburg Police Department radio that "a motorcycle had fled from them and the matter also involved an assault and battery with a loaded firearm." (Brocato Aff. at ¶ 3). Brocato "heard the Leesburg Police Department report that they had lost the motorcycle or had stopped pursuing it." (*Id.*). As the officers were deciding how to proceed at the Blueberry Hill Apartments, Brocato "told the other three officers the information [he] had heard on the radio about the Leesburg Police Department pursuit and that the motorcyclist [the Leesburg Police] were pursuing was possibly armed." (*Id.* at ¶ 7).[6]

The officers decided to "go knock on doors at the complex [to] try to gather information about the motorcycle's owner and the operator." (Dorrier Aff. at ¶ 5).[7] The officers turned their attention to Apartment 114 because the lights were on inside, and the motorcycle and SUV were parked in front of that apartment. (*Id.* at ¶ 6); (Sylvester Dep. at 93:12-19); (Brocato Aff. at ¶ 8); (McDaniel Aff. at ¶ 6).[8] Brocato states that the officers did not know which apartment the suspect might be in; the officers did not have an arrest or search warrant; and the occupants of

6 Brocato also states that "[f]leeing and eluding an officer is a felony." (Brocato Aff. at ¶ 7).

7 At her deposition, Dorrier testified that she was aware the Blueberry Hill Apartments did not have assigned parking spaces. (Lisa Dorrier Dep. (Doc. No. 39) at 73:24-74:4).

8 Sylvester also testified at his deposition that he saw a footprint in the sand behind the motorcycle leading to the door of Apartment 114. (Sylvester Dep. at 93:12-19).

Apartment 114 were not suspects of any police action. (Brocato Aff. at ¶ 8); *see also* (McDaniel Aff. at ¶ 6). The officers were only seeking information. (*Id.*).

However, unbeknownst to the four officers at the time, Brown, the registered owner of the motorcycle and white SUV, was not inside Apartment 114 at the Blueberry Hill Apartments; Brown was inside Apartment 124. (Dorrier Aff. at ¶ 11); (Brocato Aff. at ¶ 15). Andrew Scott ("Scott") and his girlfriend, Miranda Mauck, lived in Apartment 114. (Miranda Mauck Dep. (Doc. No. 42) at 32:5-25).

On July 14, 2012, Scott arrived home from work around eight or nine o'clock in the evening. (*Id.* at 60:2-3). After Scott got home that night, he never left the apartment and Mauck was the only other person inside Apartment 114 with him. (*Id.* at 60:10-16). That evening, Mauck and Scott ate dinner, watched TV, and played video games. (*Id.* at 60:17-25, 62:6-18).

At approximately 1:30 a.m. (*see id.* at 62:19-21), the four officers outside Apartment 114 decided to knock on the door to gather information about the owner of the motorcycle. (Brocato Aff. at ¶ 8); (McDaniel Aff. at ¶ 6). Brocato states that "[b]ecause of the possibility the suspect might be armed, [the officers] took tactical positions at the front door of the apartment." (Brocato Aff. at ¶ 9).[9] Sylvester stood on the ground to the left of the front door of Apartment 114 with a fence to his left. (Sylvester Aff. at ¶ 7).[10] There is a "concrete slab directly in front of the door that was about eight inches high and the width of the door." (McDaniel Aff. at ¶ 7). Further, the threshold sits about "eight inches above the slab." (*Id.*). Thus, according to McDaniel, Sylvester was "about sixteen inches lower than the threshold" when Sylvester was standing on the ground outside Apartment 114. (*Id.*). McDaniel positioned himself to the right of the front door in

---

9 McDaniel states that as the officers approached the door, "Deputy Brocato reminded [the officers] that the motorcyclist might possibly be armed." (McDaniel Aff. at ¶ 7)

10 The parties describe the scene as if facing the front door from the outside of Apartment 114. The Court does the same.

between two front windows of the apartment with his right shoulder touching the wall. (*Id.*). Brocato and Dorrier stood to the left of Sylvester and on the other side of a privacy fence separating Apartments 114 and 115. (Brocato Aff. at ¶ 9); (Dorrier Aff. at ¶ 7). Brocato positioned himself between the front windows of Apartment 115 and Dorrier positioned herself to Brocato's left. (*Id.*).

From here, the events leading to Scott's death transpired quickly.

As they took positions in front of Apartment 114, all four officers had their guns drawn. (Sylvester Aff. at ¶ 7); (Dorrier Aff. at ¶ 7); (Brocato Aff. at ¶ 9); (McDaniel Aff. at ¶ 7). Sylvester, with his right hand holding his gun behind his leg, knocked on the door of Apartment 114 with his left hand "in two separate sets of three knocks each." (Sylvester Aff. at ¶¶ 7, 8); (Sylvester Dep. at 106:16-107:8). Sylvester states that he "knocked on the door in a normal manner because there might be children inside and also [because he] did not want to wake all the neighbors." (Sylvester Aff. at ¶ 8).[11] Sylvester planned to knock on the door "only three sets of three knocks each." (*Id.*). Sylvester further stated that he would have left if there were no response. (*Id.*).

At no point did any of the officers identify themselves as law enforcement. (Sylvester Dep. at 102:7-13); (McDaniel Dep. at 101:3-6). Further, at no point prior to the door opening did any of the police vehicles at the apartment complex have their emergency lights on. (McDaniel Aff. at ¶ 5).

---

11 The parties dispute how loudly Sylvester knocked on the door. David Kavetsky, who lived in Apartment 96, testified that he saw an officer at the door of Apartment 114 who knocked three times. (David Kavetsky Dep. (Doc. No. 51) at 7:8-9, 31:17-22). Kavetsky stated that the knock was "very loud." (*Id.* at 31:23-32:1). Zachary Thurman, who lived in Apartment 95, and stood about seventy-five to eighty yards away from Apartment 114 at the time of the knocking, described the knock as a "very loud pound." (Zachary Thurman Dep. (Doc. No. 47) at 6:3-5, 28:23-29:9, 33:7-12). Dorrier states that it "was a regular knock, but sounded loud because the doors are hollow." (Dorrier Aff. at ¶ 8).

The resident in the adjacent Apartment 115 must have heard Sylvester knocking because, at some point after Sylvester began knocking, the resident came to his front door. (Dorrier Aff. at ¶ 8). Dorrier, the closest officer to Apartment 115, re-holstered her gun and went to the door. (*Id.*). Dorrier told the resident that the officers were looking for the owner of the motorcycle. (*Id.*). According to Dorrier, "[t]he man gestured with his right hand towards the building to his right and said, 'he lives over there.'" (*Id.*).

Sylvester states that he overheard a small part of this conversation and that he heard someone say, "he lives over there." (Sylvester Aff. at ¶ 9). Immediately after overhearing this conversation behind him, the door to Apartment 114 opened. (*Id.*).

Sylvester states that the "door to Apartment 114 was flung open with force and, without a word, a man was standing there with his arm extended and a semi-automatic pistol pointed straight at my face." (*Id.*).[12] Sylvester believes that he screamed, "Gun!" (*Id.*).[13] Sylvester states that the man with the gun began backing away while still pointing the gun at Sylvester's face. (*Id.* at ¶ 10). According to Sylvester, Scott, the man with the gun, began closing the door and "edging behind it," which Sylvester perceived as an attempt to take cover so that Scott could fire on Sylvester. (*Id.*). Sylvester states that he was afraid for his life and the lives of the other

12 As discussed in greater detail below, the parties dispute the position of the gun at the moment Scott opened the door to Apartment 114. Zachary Thurman testified that from where he stood he could see into the interior of the apartment when the door opened. (Thurman Dep. at 34:9-17). Thurman stated that he saw a "partial arm" for a short period of time, which "disappeared after the gunshots." (*Id.* at 35:8-15). However, Thurman further states that "[i]f there was a firearm, it was moved so quickly that [he] would not have been able to tell that it was."). (*Id.* at 36:9-12).

13 The record is not clear on precisely what was said, although it appears that at the very least Sylvester said the word "gun." McDaniel states that he heard "Sylvester yell something like 'Gun! Drop the gun!'" (McDaniel Aff. at ¶ 10). Dorrier states that she heard Sylvester yell, "Show me your hands" and "Gun!" (Dorrier Aff. at ¶ 9). Brocato states that he heard Sylvester yell, "Gun!" (Brocato Aff. at ¶ 11). Brocato also thinks Sylvester said, "Show me your hands," but Brocato is not sure about that statement. (*Id.*). Thurman heard "drop the gun" immediately followed by gunfire. (Thurman Dep. at 35:4-7, 35:23-25). Kavetsky testified that after the door opened, he heard "a muffled sound from one of the officers [] and then [he] heard the word gun distinctly and clear." (Kavetsky Dep. at 32:11-19).

deputies, so he fired his gun and shot Scott. (*Id.*). Sylvester fired six shots in total; three bullets hit Scott. (Kris Lee Sperry Dep. (Doc. No. 44) at 11:1-7). Scott died as a result of his injuries. (*Id.* at 12:4-8).

Sylvester's last shot "hit the door jamb" and Sylvester could not "go any further to his left." (Sylvester Aff. at ¶ 10). As a result, Sylvester states that he had to go into the apartment to further engage Scott. (*Id.*). Sylvester further states that he could not stay where he was standing outside because Scott would have been able to shoot Sylvester. (*Id.*). Sylvester went through the door and immediately to the left because he knew that Scott had gone left. (*Id.*). According to Sylvester, the entire incident at the door "took about two seconds." (*Id.*).[14] When Sylvester entered Apartment 114, he saw Scott slumped on the couch with the gun on the couch beside Scott's left hand. (*Id.* at ¶ 11).[15]

At this point, Sylvester saw Mauck running down a short hallway in the apartment towards Sylvester, screaming. (*Id.* at ¶ 12). Sylvester did not perceive her as a threat. (*Id.*). After checking the other rooms to see if anyone else was in the apartment, Sylvester grabbed a rag from the kitchen to put pressure on Scott's wounds. (*Id.*). McDaniel, a SWAT medic, entered the apartment behind Sylvester and began administering first aid on Scott. (McDaniel Aff. at ¶ 12). After hearing shots fired, Brocato and Dorrier went around the fence towards Apartment 114. (Brocato Aff. at ¶ 12); (Dorrier Aff. at ¶ 9). Brocato helped McDaniel move Scott to the floor

---

14 Thurman testified that "less than three seconds" passed from the time he saw the door open to the time the "gunfire from the officer occurred." (Thurman Dep. at 22:16-20). Thurman also stated that the time from when he heard "drop the gun" to the time shots were fired was "simultaneous" and that six shots were fired within a period of one and one half seconds "immediately after [Sylvester] [said] drop the gun." (*Id.* at 22:24-23:5). Kavetsky testified that the length of time between the door opening and the time he heard gunshots was "two seconds, three seconds." (Kavetsky Dep. at 37:16-19).

15 Plaintiffs state in their "Statement of Material and Undisputed Facts" that Scott's weapon "was later found not to have a bullet in the chamber." (Doc. No. 35 at p. 9, ¶ 43 (citing Sylvester Dep. at 142)). Plaintiffs' citation to Sylvester's deposition testimony does not reflect that fact; rather, Sylvester testified that he would not have known at the time the door opened whether there was a bullet in the chamber. (Sylvester Dep. at 142:11-14).

and assisted McDaniel in performing CPR until other deputies arrived and took over. (Brocato Aff. at ¶ 14). When Dorrier arrived at the front door of Apartment 114, she saw Mauck in the apartment, hysterical and screaming. (Dorrier Aff. at ¶ 10). Dorrier directed Mauck to come with her and took Mauck outside towards her patrol car. (*Id.*).

From Mauck's perspective, at about 1:30 in the morning, she heard a "really loud bang at the door." (Mauck Dep. at 70:23-25). Mauck testified at her deposition that there were "two separate" knocks, such that it sounded like "bang, bang, bang; a stop; and then bang, bang, bang." (*Id.* at 71:1-3, 71:11-21). Mauck further stated that the pause between the two sets of knocks was "[m]aybe, like, 15, 20 seconds." (*Id.* at 71:22-25).

After hearing the first set of knocks, Mauck and Scott went into the bedroom to get dressed. (*Id.* at 75:14-24). As they were getting dressed, Mauck heard a second set of knocks, which she described as being "scary" and "startling." (*Id.* at 88:13-17). As Mauck continued to get dressed, Scott grabbed a gun out of a dresser drawer and walked to the door. (*Id.* at 78:9-22). Mauck stated that she was standing four or five feet behind Scott in the hallway between the living room and the bedroom and could see Scott open the door. (*Id.* at 78:20-25, 79:12-15, 80:1-2).[16]

Mauck testified that Scott opened the door with his right hand and held the gun in his left hand. (*Id.* at 80:8-11).[17] In regards to the manner in which Scott opened the door, Mauck stated to the FDLE investigator immediately after the incident that "[Scott] just opened it like medium speed, I don't know it wasn't like slow but he didn't sling it open." (Doc. No. 48 at p. 19).

---

16 The front door to Apartment 114 did not have a peephole, (Mauck Dep. at 54:19-21), and the apartment did not have a back door. (Sylvester Dep. at 95:20-23).

17 Scott was right handed. (Mauck Dep. at 48:17-18).

Mauck testified that Scott's left arm, which held the gun, was "straight down" and that she never saw Scott raise the gun. (Mauck Dep. at 80:12-14, 81:2-4).

Mauck heard several gunshots and then saw Scott fall back onto the couch. (*Id.* at 81:7-11). Mauck saw Sylvester enter the Apartment and Sylvester asked her if there was anyone else inside the apartment. (*Id.* at 86:19-24). Shortly thereafter, a female officer grabbed Mauck and took her outside. (*Id.*). Mauck estimates that forty-five seconds elapsed from the time the officers came through the front door until the time she left with the female officer. (*Id.* at 86:11-15). Mauck had cuts on the bottom of her feet from when she left the apartment because there was broken glass on the floor. (*Id.* at 82:1-8). These injuries did not require medical care. (*Id.* at 108:15-20).

Sheriff Gary Borders ("Borders") states that when an officer knocks on the door of a dwelling and is executing a search or arrest warrant, the officer is "required to announce that he is law enforcement and his purpose, as in that situation he intends to enter the dwelling, forcibly if necessary." (Gary Borders Aff. (Doc. No. 50-7) at ¶ 7). However, "[w]hen an officer is knocking on the door of a dwelling to ask the occupant for assistance in obtaining information, there is no requirement that he must announce himself as law enforcement." (*Id.* at ¶ 8). Borders further states that this is also true if an officer "is seeking a suspect who may be in the dwelling, but [the officer] does not intend to enter the dwelling forcibly." (*Id.*). "Accordingly, the Sheriff's Office does not have a policy, custom, or procedure addressing whether an officer must announce that he is law enforcement when he knocks on the door for that purpose." (*Id.*). Whether an officer announces as law enforcement "when knocking for that purpose is left to the discretion of that particular officer because each situation is different and the appropriate actions may differ also." (*Id.*).

No policy changes occurred since the events of July 15, 2012. (Gary Borders Dep. (Doc. No. 37) at 28:13-16). Deputy Sylvester was not disciplined for his actions that evening. (*Id.* at 37:16-19).

## II. SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the movant who bears the initial burden of "identifying for the district court those portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994)). In the case in which the non-movant bears the burden of proof at trial, the movant may carry its initial burden by either negating an essential element of the non-movant's case or by demonstrating the absence of evidence to prove a fact necessary to the non-movant's case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993) (citation omitted). Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact. *Id.* at 1116. If the movant demonstrates the absence of evidence on a material fact for which the non-movant bears the burden of proof, then the non-movant must either show that the record contains evidence that the movant "overlooked or ignored" or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17 (citation omitted). The non-movant must provide more than a "mere scintilla of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation

omitted).

Federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." (citation omitted)). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead [will] accept [the non-moving party's] version of the facts drawing all justifiable inferences in [the non-movant's] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008). Notwithstanding this inference, "[t]here is [still] no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349. In the context of cross-motions for summary judgment, the summary judgment standard does not change. *Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co.*, 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008).

## III. <u>LEGAL ANALYSIS</u>

### A. *Counts II & VI: Personal Representatives' and Mauck's § 1983 Claims Against Borders*

The Court addresses Plaintiffs' claims chronologically. Therefore, the Court begins with Plaintiffs' Motion for Partial Summary Judgment as the claims argued in that motion concern the actions of the LCSO officers leading up to the moment Scott opened the door to Apartment 114. As an initial matter, however, the Court notes the confusion surrounding Mauck's Count VI. In Plaintiffs' Response to Defendants' Motion for Summary Judgment, Mauck states that she "adopts the Estate's legal arguments made in its Motion for Partial Summary Judgment as well as its response to Defendants' Motion for Summary Judgment as to Count II." (Doc. No. 52 at p.

8, n.2) (citations omitted). However, Plaintiffs' Motion for Partial Summary Judgment only sought summary judgment on the Personal Representatives' Count II, not on Mauck's Count VI. (*See* Doc. No. 35 at p. 25) ("Summary judgment under Count II of the Amended Complaint . . . is warranted and should be granted . . . .").[18] Despite Plaintiffs' apparent oversight in failing to move for summary judgment on Mauck's claim, the Court will address Counts II and VI together. Plaintiffs argue that Count II and Count VI are

> based on the same legal theory: that the custom or practice of the Sheriff in not requiring deputies to identify themselves in a "knock-and-talk" executed in the middle of the night, with weapons drawn, in confronting an innocent homeowner and in the absence of probable cause, warrant or exigency, constitutes a constructive entry of a private home in violation of the Fourth Amendment.

(Doc. No. 52 at pp. 8-9).

1. Municipal Liability

Section 1983 creates a private cause of action for deprivations of federal rights by persons acting under color of state law. 42 U.S.C. § 1983. Municipalities and other local-government units are included among the "persons" to whom § 1983 applies. *Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under § 1983, a governmental entity may not be held liable under a theory of *respondeat superior,* but instead may only be held liable when its "official policy" causes a constitutional violation. *See id.* at 694, 98 S.Ct. 2018. Plaintiffs can establish the requisite "official policy" in one of two ways: (1) identifying an officially promulgated policy, or (2) identifying an unofficial custom or practice shown through the repeated acts of the final policymaker of the entity. *Grech v. Clayton Cnty., Ga.,* 335 F.3d 1326, 1329-30 (11th Cir. 2003) (citations omitted). A plaintiff must identify

18 Confusingly, the reply brief to Defendants' Response to the Personal Representatives' Motion for Summary Judgment, filed after Mauck's representation that she is "adopting" the Personal Representatives' legal arguments, still appears to seek summary judgment only as to Count II. (*See* Doc. No. 58 at p. 6) ("Plaintiffs respectfully request that this Court grant partial summary judgment against the Sheriff under Count II in favor of the ESTATE").

the policy or custom, which caused his injury so that liability will not be based upon an isolated incident, *McDowell v. Brown,* 392 F.3d 1283, 1290 (11th Cir. 2004) (citation omitted), and the policy or custom must be the moving force of the constitutional violation. *Grech,* 335 F.3d at 1330; *see also Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the [entity] . . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Cooper v. Dillon,* 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)).

To demonstrate municipal liability, a plaintiff must also establish a "direct causal link between a municipal policy and the alleged constitutional injury." *Amer. Fed'n of Labor and Cong. of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1187 (11th Cir. 2011). "When a municipal policy itself violates federal law, or directs a municipality to do so, resolving issues of fault and causation is straightforward." *Id.* (citation omitted). However, "[i]f a facially-lawful municipal action is alleged to have caused a municipal employee to violate a plaintiff's constitutional rights, the plaintiff must establish 'that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" *Id.* (citation omitted).

Further, "the mere delegation of authority to a subordinate to exercise discretion is not sufficient." *Mandel v. Doe,* 888 F.2d 783, 792 (11th Cir. 1989). The Eleventh Circuit has

> strictly interpreted *Monell*'s policy or custom requirement to preclude § 1983 liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion. In other words, final policymaking authority over a particular subject matter does not vest in an official whose decisions are subject to meaningful administrative review.

*Doe v. School Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1264 (11th Cir. 2010) (citations omitted). Finally, an official with final policymaking authority may ratify the actions of a

subordinate by "actively endorsing or approving" of the subordinate's conduct. *Garvie v. City of Fort Walton Beach, Fla.*, 366 F.3d 1186, 1189 (11th Cir. 2004).

2. "Knock-and-Talk" Investigative Technique

Plaintiffs begin their argument with *Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), where Plaintiffs claim the Supreme Court "reaffirmed" the "sanctity of the home." (Doc. No. 35 at p. 15). Plaintiffs direct the Court to *Hudson's* majority opinion, where Justice Scalia stated, "[the] principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one." *Hudson*, 547 U.S. at 589, 126 S.Ct. 2159. As the *Hudson* majority noted, the "knock-and-announce" requirement is constitutionally mandated,[19] having its origins in the common law. *See id.* (citing *Wilson v. Arkansas*, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)); *see also Kornegay v. Cottingham*, 120 F.3d 392, 396 (3d Cir. 1997) (It is well-established that "[t]he 'commonlaw requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry' is incorporated into the Fourth Amendment's guarantees." (quoting *Richards v. Wisconsin*, 520 U.S. 385, 387, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997))).[20] The Supreme Court in *Hudson* recognized three interests protected by the knock-and-announce rule: (1) "the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident;" (2) "the protection of property" so that an individual may "avoid the destruction of property

19 The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

20 This rule is codified in the United States Code. *See* 18 U.S.C. § 3109 ("The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.").

occasioned by a forcible entry;" and (3) the "elements of privacy and dignity that can be destroyed by a sudden entrance." *Hudson*, 547 U.S. at 594, 126 S.Ct. 2159.

However, as Defendants point out, *Hudson* was not a knock-and-talk case; it was a knock-and-announce case. In *Hudson*, the police were executing a warrant they had obtained which authorized the search of a home for drugs and firearms. *Id.* at 588, 126 S.Ct. 2159. Indeed, *Hudson's* declaration of the interests protected by the knock-and-announce rule all contemplate *entry* into the home. Thus, the interest Plaintiffs direct the Court to consider most fervently – the protection of human life and limb because an unannounced entry may provoke violence in supposed self-defense by the surprised resident – should be read in the context of the knock-and-announce requirement of the Fourth Amendment prior to entry of a home during the execution of a warrant. This scenario, of course, presupposes that the police will force entry into the home even after giving opportunity to the residents to open the door.[21]

Here, it is undisputed that the LCSO officers did not have a warrant to enter and search Apartment 114 at the Blueberry Hill Apartments. Up until the point Scott answered the door wielding a gun, there is no evidence to show that the officers ever intended to forcibly enter the apartment. In fact, the evidence presented shows the opposite to be true. Sylvester states that had nobody answered the door, the officers would have left. To be sure, at no point did the LCSO officers announce their presence to the residents of Apartment 114; however, they were not constitutionally required to do so because the officers were not executing a warrant and had no intention of forcing entry into Apartment 114. The LCSO officers directed their attention to

21 In *Hudson*, the state of Michigan, from the trial level onward, conceded that the entry in that case constituted a knock-and-announce violation. *Hudson*, 547 U.S. at 590, 126 S.Ct. 2159. Therefore, the only issue before the *Hudson* Court was the remedy available for such a violation. *Id.* The Court ultimately held that the exclusionary rule did not apply and that suppression of the evidence obtained after the entry was not an available remedy for a knock-and-announce violation. *Id.* at 594, 126 S.Ct. 2159 ("What the knock-and-announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant.").

Apartment 114 at 1:30 in the morning because the lights were on inside and the motorcycle, whose engine was still hot, had been parked in front of that apartment. Under the circumstances presented, the officers were reasonably permitted to knock on the door of Apartment 114 in furtherance of the legitimate purpose of talking with the occupants to search for information about the motorcyclist who had eluded Sylvester just moments before and who could possibly be linked to the Leesburg matter involving an assault and battery with a loaded firearm.

"The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *U.S. v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) (no warrant necessary for officers to approach house to question the occupants)). "Absent express orders from the person in possession,' an officer may 'walk up the steps and knock on the front door of any man's 'castle,' with the honest intent of asking questions of the occupant thereof." *Taylor*, 458 F.3d at 1204 (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964)).

As the Supreme Court recently recognized, "police officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' *i.e.*, knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence." *Florida v. Jardines*, --- U.S. ---, 133 S.Ct. 1409, 1423, 185 L.Ed.2d 495 (2013) (citing *Kentucky v. King*, 563 U.S. ---, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do")); *see also Taylor*, 458 F.3d at 1204 (finding that officer's entry onto the property for a knock-and-talk is conduct not prohibited by the Fourth

Amendment); *Morris v. Town of Lexington, Alabama*, 748 F.3d 1316, 1324 (11th Cir. 2014). A knock-and-talk is an "investigative technique whereby an officer knocks on the door to a residence and attempts to gather information by explaining to the occupants the reason for the police interest." *United States v. Norman*, 162 F. App'x 866, 869 (11th Cir. 2006) (per curiam).[22] During a knock-and-talk investigation, "citizens are free not to cooperate with" the investigation, and, "absent a warrant, police cannot detain them, demand entry into their homes, or otherwise compel their cooperation unless an exception to the warrant requirement applies." *United States v. Butler*, 405 F. App'x 652, 656-57 (3d Cir. 2010) (unpublished) (citation omitted).

Apparently recognizing the deficiencies with their knock-and-announce argument, Plaintiffs argue that "[n]ot all knock and talks will be deemed consensual in nature so as to avoid Fourth Amendment scrutiny." (Doc. No. 35 at p. 18). Plaintiffs, citing to various non-binding authorities, argue that a knock-and-talk may be invalidated if police "constructively enter" a home. (*Id.* at pp. 18-19). Plaintiffs summarily conclude, "Without question, there was a seizure of Scott's home and his person when the police surrounded his home with weapons drawn at 1:30 in the morning." (*Id.* at p. 19).[23] The cases Plaintiffs cite to do not support such a finding.

In *State v. Triana*, 979 So. 2d 1039 (Fla. 3d DCA 2008), four police officers arrived outside the locked gate of Eudenis Triana's ("Triana") two-acre residence at 9 p.m. after receiving information from a confidential informant that Triana had possibly been growing marijuana. *Id.* at 1041. When the officers arrived, the front gate to the property was closed and nobody was outside the residence. *Id.* One of the officers "blew the emergency horn on his police

---

22 Unpublished opinions in this Circuit are not considered binding, but may be cited as persuasive authority. *See* 11th Cir. R. 36-2.

23 As Plaintiffs' argument here appears to recognize, the circumstances changed significantly the moment that Scott opened the door holding a gun. Therefore, the Court limits its discussion in this section to the circumstances leading up to the moment Scott opened the door, i.e. the "seizure of Scott's home and his person when the police surrounded his home with weapons drawn at 1:30 in the morning." (Doc. No. 35 at p. 19). The Personal Representatives' excessive force claim is addressed in Section III.B.

car" and eventually Triana emerged from the residence and met the officers at the gate. *Id.* Triana ultimately gave his consent to the officers to search the property and allowed the officers to enter his home. *Id.* Once inside the residence, the officers saw another building on the property and obtained Triana's written consent to search that building. *Id.* at 1041-42. As a result of the search, the officers seized 103 pounds of marijuana. *Id.* at 1042.

Triana sought suppression of the evidence obtained by the search, arguing that the encounter constituted an illegal seizure. *Id.* Triana prevailed in the trial court; however, Florida's Third District Court of Appeal reversed. *Id.* at 1045. The District Court of Appeal noted that a knock-and-talk is a legitimate investigative procedure "so long as the encounter does not evolve into a constructive entry." *Id.* at 1043 (citations omitted). As to what constitutes a constructive entry, the court stated:

> [A] consensual encounter at the doorstep may evolve into a constructive entry when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home. Constructive entry has been found when a suspect emerged from a house in response to coercive police conduct. Coercive police conduct occurs where there is such a show of authority that [the] Defendant reasonably believed he had no choice but to comply.
>
> The presence of police officers alone, absent any indication of coercive words or acts, misrepresentation, deception, or trickery is insufficient to raise an inference of submission to police authority. The difference between a consensual encounter and a constructive entry frequently depends on the show of force exhibited by the police. As such, drawn weapons, coercive actions and demands, or raised voices by the police have been found to result in non-consensual encounters.

*Id.* at 1044 (citations and quotations omitted) (second alteration in original). The *Triana* court noted that the fact that "four officers were present during the encounter with Mr. Triana does not necessarily indicate coercion," especially where, as in that case, the police were dealing with a narcotics investigation. *Id*. "Nor does the fact that the officers' meeting with Mr. Triana occurred at 9 p.m. transform an otherwise consensual encounter into a seizure." *Id.* at 1045. The court

ultimately held that the "totality of the circumstances" revealed that the officer conduct did not rise to the level of conduct that would constitute a constructive entry. *Id.*

Even taking all the facts and all justifiable inferences therefrom in the light most favorable to Plaintiffs, the Court agrees with Defendants that the LCSO officers did not constructively enter Apartment 114, thereby violating Scott's and Mauck's Fourth Amendment rights. The only "overbearing tactic" used by the officers was knocking on the front door of Apartment 114. Even if Sylvester knocked on the door very loudly, this cannot, under the circumstances presented, be considered such an overbearing tactic that it essentially forced Scott or Mauck out of their apartment. Nor can loudly knocking be considered coercive conduct so as to amount to "such a show of authority" that Scott and Mauck reasonably believed they had no choice but to comply.

Defendants do not dispute that all four officers unholstered their weapons prior to knocking on the door; however, there is no evidence presented to show that either Scott or Mauck knew that the LCSO officers had their guns drawn. In fact, there is no evidence presented to show that Scott or Mauck knew that more than one person was outside the apartment. Further, Plaintiffs concede "there is absolutely no evidence" to show that Scott realized that the individual outside of his door was a law enforcement officer. (Doc. No. 35 at p. 14). Thus, even though the officers had their weapons unholstered, this could not constitute a "show of force" because Scott and Mauck had no idea that LCSO officers were outside, much less that the officers had their weapons drawn. The LCSO officer conduct here simply cannot constitute a constructive entry of Apartment 114.

Plaintiffs also cite to *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001), a Sixth Circuit case, which the Court also finds to be distinguishable. In *Saari*, four police officers, with no

warrant, responded to a "shots fired" call. *Id.* at 806. Upon arriving at the scene, the officers learned that shots had not actually been fired. *Id.* Rather, the police learned that the defendant was seen standing in a window "with what appeared to be a pistol in his hand." *Id.* The officers took positions outside defendant's apartment with their weapons drawn and approached the front door. *Id.* at 806-07. After the officers knocked and announced their presence, the defendant opened the door and the police ordered him to come out of his apartment. *Id.* at 807. The police asked if the defendant had a weapon and the defendant responded that he had a gun in the waistband of his pants, which the officers seized. *Id.*

The Sixth Circuit Court of Appeals agreed with the district court that as a practical matter the defendant was under arrest from the inception of his encounter with the officers. *Id*. at 808. As the *Saari* court noted:

> Here, the officers positioned themselves in front of the only exit from Defendant's apartment with their guns drawn. They knocked forcefully on the door and announced that they were the police. Upon opening the door, Defendant was instructed to come outside, which he did. Under these circumstances, a reasonable person would have believed that he was not free to leave. Tellingly, Officer Cleveland acknowledged that Defendant would not have been permitted to stay inside of his apartment.

*Id.* Therefore, the Sixth Circuit found that the officers' actions constituted a constructive entry and unconstitutional in-home arrest of the defendant. *Id*. at 809-10. The Sixth Circuit affirmed the district court's order granting the defendant's motion to suppress because the gun was seized incident to the defendant's illegal warrantless arrest. *Id.* at 812.

The circumstances presented in *Saari* are unlike those presented here. Significantly, "the officers [in *Saari*] *summoned* Defendant to exit his home and acted with such a show of authority that Defendant reasonably believed he had no choice but to comply." *Id*. at 809 (emphasis

added).[24] Although the officers in this case positioned themselves in front of the only exit to Apartment 114 with their guns drawn, the LCSO officers did not order Scott or Mauck out of their apartment. As discussed previously, there is no evidence to show that Scott or Mauck even knew that the officers had their guns drawn. Further, there is no evidence presented, unlike in *Saari*, to show that the officers would not have permitted Scott or Mauck to stay in Apartment 114; to the contrary, the unrebutted testimony in this case is that the officers would have been required to leave if nobody answered the door. The only activity outside of the apartment that Scott and Mauck knew of was that someone had knocked on their door loudly. As discussed above, this is not such a "show of authority" that would permit Scott and Mauck to believe they would not have been permitted to stay inside their apartment. Plaintiffs' argument that "[i]t is highly unlikely that Scott would have been allowed to walk past the officers and ignore their presence," (Doc. No. 58 at p. 2), is completely speculative.[25] In short, even taking the facts in a light most favorable to Plaintiffs, no constitutional violation occurred.

Therefore, absent a constitutional violation, Plaintiffs' theory – that the LCSO officers' constructive entry is the constitutional violation which, in turn, proximately caused Scott to be shot and Mauck to be injured – must fail. (*See* Doc. No. 52 at p. 9) ("The injuries sustained by both the Estate and Mauck proximately flowed from the antecedent police misconduct under the

---

24 The district court in *Saari* specifically found that the police ordered the defendant to leave his apartment:

> According to defendant, the officers had their weapons pointed at him and instructed him to step outside. The court finds defendant's uncontroverted testimony that he was ordered to come out of the apartment to be credible and finds as a fact that such order was given. Defendant testified that he stepped outside because he was ordered to do so and he was afraid of being shot. He stepped out with his hands above his head.

*Saari*, 272 F.3d at 807 (citing *United States v. Saari,* 88 F. Supp. 2d 835, 838 (W.D. Tenn. 1999)).

25 The Court also finds Plaintiff's reliance on *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), to be unpersuasive. *See id.* at 1161 (finding unlawful in-home arrest where ten officers surrounded a house, blocked the defendant's car, "flooded the house with spotlights[,] and summoned [the defendant] from his mother's home with the blaring call of a bullhorn").

reasoning [of *Hudson*].”); *see also* (Doc. No. 35 at p. 21) (“[Scott’s] death nonetheless was the proximate result of the antecedent Fourth Amendment violation.”).[26]

In support of this proximate causation argument, Plaintiffs cite to a district court case from another circuit, *Rush v. City of Mansfield*, 771 F. Supp. 2d 827 (N.D. Ohio 2011), wherein the Northern District of Ohio held:

> It is this basic principle of proximate cause that *Hudson* applies: “an unannounced entry may provoke violence in supposed self-defense by the surprised resident.” The rule is simple: when a constitutional violation occurs, liability attaches for harm that is the direct and proximate result of that constitutional violation, but only for such harms. Applying that principle to this case, then, if the Defendants failed to *knock-and-announce* their presence as required by the Fifth [sic] Amendment, or otherwise committed a constitutional violation *when executing the warrant*, and if that failure was the proximate cause of [the decedent’s] death, the Plaintiffs may recover under § 1983 for that harm.

*Id.* at 857 (internal citations omitted) (emphasis added). However, as is quite clear from that holding, *Rush* dealt with the execution of a warrant which mandated that the police knock-and-announce their presence as required by the Fourth Amendment. As to this requirement, the *Rush* court found particularly troubling what the court characterized as the officers’ “grenade-and-announce” tactic:

> The Court cannot accept Defendants’ argument that a grenade-and-announce is sufficient to comply with knock-and-announce, particularly where the police combine the grenade with “blinding beams” that prevent their visual identification as police. The knock-and-announce requirement is not an abstract requirement that officers utter the talismanic word “police” at some point prior to entry, but a requirement that law enforcement officials afford residents “an opportunity to respond to and cooperate with the police presence in lieu of having to face an unexpected and threatening intrusion.” Grenade-and-announce does not give occupants the opportunity to cooperate “in lieu of having to face an unexpected and threatening intrusion.” The grenade *is* the “unexpected and threatening intrusion.”

---

26 Presumably Mauck’s injuries that proximately resulted from her alleged seizure via constructive entry were the cuts on her feet from the broken glass as she left the apartment.

*Id.* at 869 (internal citations and footnotes omitted). Therefore, the district court found that a reasonable jury could find that the *Rush* defendants failed to "comply with the constitutional requirement that [the police] identify themselves . . . prior to commencing their seizure." *Id.*

*Rush* is clearly inapposite for multiple reasons. First, the police in *Rush* were executing a warrant and deployed flash-bang grenades before forcing entry into the home; here, the LCSO officers simply knocked on the front door of Apartment 114. Thus, the facts of *Rush* are so dissimilar to the instant case that any comparison between the two cases would not be useful. Second, as stated above, the instant case is not a knock-and-announce case like *Rush*. In this case, the police were conducting a knock-and-talk and never had any intention of forcing entry into and searching Apartment 114. Third, and most importantly, the Court's conclusion that the LCSO officers did not constructively enter Apartment 114 precludes the proximate causation analysis for which Plaintiffs cite *Rush* because there was no underlying Fourth Amendment violation in this case.

3. <u>Municipal Liability Conclusion</u>

The knock-and-talk tactic employed by LCSO officers in this case was constitutional. The knock-and-announce requirement of the Fourth Amendment was never implicated here because the police never had any intention of entering or searching Apartment 114 prior to Scott opening the door with a gun in his hand. Even taking all the facts and inferences in Plaintiffs' favor, the LCSO officers did not "constructively enter" Apartment 114 so as to violate the constitutional rights of Scott and Mauck. This finding forecloses Plaintiffs' municipal liability claims.[27] "In order to establish municipal liability under § 1983, the plaintiff must first establish

---

27 Plaintiffs do not argue that the LCSO has a custom or policy of using excessive force. Indeed, Plaintiffs' argument that Counts II and VI are "legally identical" precludes any such argument because Mauck makes no claim of excessive force. In any event, the Court ultimately concludes that Sylvester did not deprive Scott of his constitutional rights by using excessive force.

that one or more of his constitutional rights were violated." *Salvato v. Blair*, No. 5:12-cv-635-Oc-10PRL, 2014 WL 1899011, at *12 n.9 (M.D. Fla. May 12, 2014) (Hodges, J.) (citing *McDonnell v. Brown*, 392 F. 3d 1283, 1289 (11th Cir. 1987)); *see also Case v. Eslinger,* 555 F.3d 1317, 1328 (11th Cir. 2009) (absent a violation of plaintiff's rights by officer, no damages may be imposed upon the municipal employer); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471-Orl-31KRS, 2006 WL 3335066, at *3, *8 (M.D. Fla. Nov. 16, 2006) (Presnell, J.) (discussing municipal liability claims after the court had "already ruled that Plaintiffs have offered sufficient evidence to support a violation of [the plaintiff's] constitutional rights . . . ."). Defendants are entitled to summary judgment on Counts II and VI.

B. *Count I: The Personal Representatives' § 1983 Claim Against Sylvester*

In Count I, the Personal Representatives allege that Sylvester violated 42 U.S.C. § 1983 when Sylvester allegedly searched and seized the apartment of Scott and used excessive force against Scott. (Doc. No. 1 at ¶¶ 50-70). According to the Personal Representatives, Count I "is predicated on a claim of excessive force in violation of the Fourth Amendment." (Doc. No. 52 at p. 3). Yet, the Personal Representatives also appear to suggest that "antecedent police misconduct" serves as a component of this claim. (*Id.* at p. 8) ("If the jury were to believe Plaintiffs' version of the facts, this excessive use of force alone, without regard to any antecedent police misconduct . . . is a violation of the Fourth Amendment."). The Court has already rejected the Personal Representatives' contention that the LCSO officers seized Scott within the meaning of the Fourth Amendment via "constructive entry" of Apartment 114. The Court therefore turns

to the Personal Representatives' excessive force claim. Deputy Sylvester seeks summary judgment on a theory of qualified immunity. (Doc. No. 50).

1. Qualified Immunity

The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities." *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir. 2002). "The entitlement is an *immunity from suit* rather than a mere defense to liability . . . [and] it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis in original). Since the purpose of the doctrine is to "allow government officials to carry out their discretionary duties without fear of personal liability," *Steen v. City of Pensacola,* 809 F. Supp. 2d 1342, 1348 (N.D. Fla. 2011), qualified immunity protects "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002).

In resolving the matter of qualified immunity, the Court employs a multi-step, burden-shifting analysis. As an initial matter, the public official must "prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Penley v. Eslinger,* 605 F.3d 843, 849 (11th Cir. 2010) (quoting *Lee*, 284 F.3d at 1194). In this case, the Personal Representatives do not contest that Sylvester acted within the scope of his discretionary authority when the allegedly wrongful acts occurred. Therefore, the burden shifts to the Personal Representatives to establish that qualified immunity is not appropriate. *Id.*

To deny qualified immunity, the Personal Representatives must prove that "an official's conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rioux v. City of Atlanta*, 520 F.3d 1269, 1282 (11th Cir. 2008) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

Thus, the first question is whether the facts, viewed in the light most favorable to the Personal Representatives, demonstrate that Sylvester's conduct violated Scott's constitutional rights. *See Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). If there was no violation, the inquiry ends and Sylvester is entitled to qualified immunity; if there was a violation, then the next inquiry is whether the violated right was clearly established at the time of the violation. *Id.*; *see also Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). The order in which the Court addresses these two inquiries is of no consequence. *Brown*, 608 F.3d at 734 (citing *Pearson*, 555 U.S. at 239-41, 129 S.Ct. 808).

2. <u>Excessive Force Claim</u>

"[A]pprehension by the use of deadly force is a seizure . . . ." *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted). In determining the reasonableness of the force applied, courts "look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini,* 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris,* 550 U.S. 372, 382, 127 S.Ct. 1769, 1777 L.Ed.2d 686 (2007)).

In deciding whether a police officer used excessive force, the Court pays "careful attention to the facts and circumstances" of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (citing *Garner*, 471 U.S. at 8-9, 105 S.Ct. 1694). In the deadly force context, the Eleventh Circuit has observed that a police officer may constitutionally use deadly force when the officer:

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm"; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

*Morton v. Kirkwood,* 707 F.3d 1276, 1281 (11th Cir. 2013) (quoting *Vaughan v. Cox,* 343 F.3d 1323, 1329-30 (11th Cir. 2003)). Although these factors are useful, courts cannot apply them mechanically. *See Penley,* 605 F.3d at 849-50.

The Eleventh Circuit has cautioned that courts are not to view the reasonableness of a particular use of force "as judges from the comfort and safety of our chambers." *Crosby v. Monroe Cnty.,* 394 F.3d 1328, 1333-34 (11th Cir. 2004). Rather than apply "the 20/20 vision of hindsight," *Graham,* 490 U.S. at 396, 109 S.Ct. 1865, the Court "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Crosby,* 394 F.3d at 1334; *see also Jean-Baptiste v. Gutierrez,* 627 F.3d 816, 820-21 (11th Cir. 2010).

Further, the Supreme Court has emphasized that there is no precise test or "magical on/off switch" to determine when using excessive or deadly force is justified. *Scott*, 550 U.S. at 382, 127 S.Ct. 1769; *see also Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Nor must every situation satisfy certain preconditions before deadly force can be used. *See Scott,* 550 U.S. at 382, 127 S.Ct. 1769. Rather, the particular facts of each case must be analyzed to determine whether the

force used was justified under the totality of the circumstances, *see Graham*, 490 U.S. at 396, 109 S.Ct. 1865, and courts "must still slosh . . . through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383, 127 S.Ct. 1769.

i. Did Sylvester's conduct violate a constitutional right?

The Court turns to the central question in this case: whether, in light of the rapidly unfolding events at the doorstep of Apartment 114 on July 15, 2012, it was objectively reasonable under the Fourth Amendment for Deputy Sylvester to use deadly force.

The Court agrees with Defendants that analysis of this claim should be limited to the circumstances "when the shooting occurred." (*See* Doc. No. 50 at p. 20 (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1270 (11th Cir. 2003) ("In determining whether the officers in this case are entitled to qualified immunity, we analyze the precise circumstances immediately preceding Carr's being shot and not the earlier surveillance decisions or the events following the shooting."))). The Personal Representatives failed to respond to this argument, or address *Carr* in any way, but nonetheless appear to concede that the circumstances immediately preceding the shooting should be the relevant scope of the analysis by pointing out three disputed factual issues which they contend prevent summary judgment: (1) how loudly Sylvester knocked on the door to Apartment 114; (2) the manner in which Scott opened the door; and (3) whether Scott's gun was down by his side or pointing at Sylvester. (*See* Doc. No. 52 at p. 4). For purposes of this analysis, the Court accepts the Personal Representatives' version of the facts. Therefore, the Court takes as true the following facts: Sylvester knocked on the door loudly (Mauck Dep. at 70:23-25); "[Scott] just opened [the door] like medium speed . . . it wasn't like slow but he didn't sling it open" (Doc. No. 48 at p. 19); and Scott's left arm, which held the gun, was "straight down" and Scott did not raise his gun. (Mauck Dep. at 80:12-14, 81:2-4). Even accepting this version of the

events, the Court determines that Sylvester's use of deadly force was justified under the totality of the circumstances. Therefore, Sylvester did not violate Scott's constitutional right to be free from excessive force.

Defendants' argument focuses on the second of the factors in the balancing test noted above; namely, whether Scott posed an immediate threat to the safety of the officers. (*See* Doc. No. 50 at p. 16) ("[I]t was constitutionally permissible for Deputy Sylvester to use deadly force because he had probable cause to believe that Scott posed a threat of serious physical harm, to him or to others."). The Court agrees that the reasonableness analysis turns on this factor.

Even accepting the Personal Representatives' version of the facts, the Court must still assess the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Here, the officers were seeking information about a speeding motorcyclist who did not stop after Deputy Sylvester activated his emergency lights and initiated a pursuit. After Sylvester's commander called off the pursuit, Sylvester learned that the motorcyclist could be the same person being sought by the Leesburg Police Department that evening. Sylvester also learned that this individual could be armed. Deputy Brocato conveyed this same information to the deputies on the scene at the Blueberry Hill Apartments. Brocato told the officers present at the apartment complex that he had heard over the Leesburg Police Department radio that a motorcycle fled from the Leesburg Police, a felony, and that the matter involved an assault and battery with a loaded firearm. While the occupants of Apartment 114 were not suspects, due to the location of the motorcycle and the lights being on inside that apartment, it was reasonable for the LCSO officers to believe that a suspect could be in Apartment 114 or that the occupants might have information about the motorcyclist.

As the officers approached and took positions outside Apartment 114, Brocato reminded the officers that the motorcyclist might be armed. When Sylvester knocked on the door, he stood to the left of the doorframe and about sixteen inches lower than the threshold. Immediately before the door opened, Sylvester overheard a small part of the conversation with Dorrier and heard someone say, “he lives over there.” However, there is no evidence to show that Sylvester knew where “over there” was because immediately thereafter Scott opened the door.

Even if the door opened “at a medium speed” and Scott held his gun pointed down, the two were standing immediately across the threshold of the door from each other. Sylvester said, “gun!” and possibly uttered something along the lines of “drop the gun!” or “show me your hands.” Regardless of precisely what was said, it is undisputed that the events, from the time the door opened until the time shots were fired, took place rapidly within two to three seconds. According to Sylvester, after the door opened, Scott began closing the door and “edging behind it,” which Sylvester perceived as an attempt to take cover so that Scott could fire on Sylvester. Sylvester fired his gun six times and the last round “hit the door jamb” and Sylvester could not go any further to his left. Sylvester entered the apartment to “further engage” Scott and went immediately left because he knew that Scott had gone to the left. After Sylvester entered, he saw Scott slumped on the couch with the gun on the couch beside his left hand.

Considering the totality of the circumstances, it was not unreasonable for Sylvester to believe that his life was in danger in the instant the door opened and to immediately take action in self-defense. As the Eleventh Circuit has said, the Court “must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.” *Crosby*, 394 F.3d at 1334 (11th Cir. 2004). Sylvester knew that the motorcyclist who had

eluded him might be armed. It was therefore reasonable for him to believe in that split second that Scott might indeed be the motorcyclist whom the officers sought because when Scott opened the door Sylvester saw a man holding a gun. Moreover, after Scott opened the door, Sylvester stated that Scott began closing the door and edging behind it, which Sylvester reasonably perceived as an attempt by Scott to take cover so that Scott could fire. "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007); *see also Jean-Baptiste*, 627 F.3d at 821 ("Regardless of whether [the defendant] had drawn his gun, [the defendant's] gun was available for ready use, and [the officer] was not required to wait 'and hope[ ] for the best.'" (quoting *Scott*, 550 U.S. at 385, 127 S.Ct. 1769)). It was reasonable for Sylvester in that moment to have feared for his own life and have perceived an imminent threat of death or serious bodily injury. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (holding that the Constitution permits the use of deadly force against a person who poses an imminent threat of danger to a police officer or others).

Additionally, Sylvester was not required to give a warning before using deadly force. As the Fourth Circuit explained in *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994),

> For all [the officer] knew, the hesitation involved in giving a warning could readily cause such a warning to be his last. We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life.
>
> It is true that [the officer] did not see a gun in [the suspect's] hands, but it is also true that he could not confirm that [the suspect] was unarmed. We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others.

*Id.* at 1007-08; *Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003) (quoting and agreeing with the reasoning of *McLenagan*); *see also Garner,* 471 U.S. at 11-12, 105 S.Ct. 1694 (requiring a warning before using deadly force only if feasible).

The Personal Representatives also argue that "[e]ven Sylvester himself recognized that he would not be justified in using deadly physical force if Scott simply appeared at the door with his weapon at his side." (Doc. No. 52 at p. 7). This is somewhat misleading. Sylvester stated that if Scott's gun had not been pointed at Sylvester, he would not have shot Scott. Sylvester did not say that he would not have been *justified* in doing so. The following is an excerpt from the FDLE interview transcript with Sylvester:

> [Caseworker] Ok. Um had this guy opened the door, not been armed, or even been armed but not had the gun pointing at you, would you have shot him?
> [Sylvester]: No sir.
> [Caseworker]: Ok. So is it safe to say the only reason that you shot him was because he was pointing the gun directly at you?
> [Sylvester]: Yes sir.

(Doc. No. 49 at p. 23). Sylvester responded to a similar question in his deposition:

> Q: And if the occupant had opened the door without a firearm pointed at your face, what would you have done?
> A: I would have asked him to speak with me for a moment.

(Sylvester Dep. at p. 136). Regardless, the Personal Representatives' argument also fails because the reasonableness inquiry is an objective one and therefore does not take into account Sylvester's subjective intent or beliefs. *See Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir. 1990). Even accepting that Scott had his gun pointing down, Sylvester's use of deadly force was objectively reasonable.

Lastly, the Personal Representatives briefly make two arguments that the Court must address. First, the Personal Representatives suggest that "[t]he Fourth Amendment was also violated by Sylvester's pursuit of Scott into his home when he no longer posed a danger to

Sylvester or to the other deputies." (Doc. No. 58 at p. 3). Although it is not developed, and is actually argued by way of reply as to Count II, this argument essentially concedes that Scott posed a danger to Sylvester and the other deputies. In any event, exigent circumstances existed at the time so as to permit Sylvester to enter Apartment 114. *See United States v. Holloway,* 290 F.3d 1331, 1337 (11th Cir. 2002). The exigent circumstances exception to the warrant requirement "encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *Id.* at 1334 (citations omitted). Here, there was still a risk of harm to the LCSO officers because they could not have known if Scott was fully disarmed or whether other occupants of Apartment 114 may have also been armed. Sylvester stated that his last shot "hit the door jamb" and he could not "go any further to his left." Sylvester further states that he could not stay where he was standing outside because Scott would have been able to shoot Sylvester. As a result, Sylvester stated that he had to go into the apartment to further engage Scott. Thus, even taking the Personal Representatives' facts, Sylvester could lawfully enter Apartment 114 at that point because exigent circumstances existed, i.e. an ongoing risk of harm to the police.[28]

Second, the Personal Representatives argue, also by way of their reply as to Count II, that the fatal shot was fired when Scott posed no danger to the officers because, "[a]ccording to the

---

28 Sylvester could also lawfully enter Apartment 114 at this point to render emergency aid to Scott. After securing Apartment 114, Sylvester grabbed a rag from the kitchen and applied pressure to Scott's wounds. McDaniel, a SWAT medic, entered the apartment behind Sylvester and also began administering first aid to Scott. The "emergency aid" exception permits officers to make a warrantless entry into a home to provide emergency assistance to an injured occupant or to protect an occupant from "imminent injury." *Kentucky v. King,* --- U.S. ----, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006). In order for the exception to apply, officers must have an objectively reasonable belief that someone inside is "seriously injured or threatened with such injury," and is in need of immediate aid. *Brigham City,* 547 U.S. at 403-04, 126 S.Ct. 1943. The facts of this case, even taken in the light most favorable to the Personal Representatives, fall squarely within this exception.

defense medical expert, Sylvester fired the fatal shot at a time when Scott was in retreat and not pointing his weapon at Sylvester." (Doc. No. 58 at p. 4). Although this argument is similarly not developed in any significant way, the Court still finds Sylvester's actions in firing six shots were reasonable and justified. As stated above, Sylvester reasonably perceived that Scott was attempting to take cover so that he could fire on Sylvester. In response Sylvester fired six shots, the last one hitting the door jamb. Sylvester lawfully entered the apartment to "further engage" Scott and it was not until that point that Sylvester saw Scott slumped on the couch with the gun on the couch beside Scott's left hand. *See Jean-Baptiste*, 627 F.3d at 822 ("[The officer] reasonably responded with deadly force, and he was not required to interrupt a volley of bullets until he knew that [the defendant] had been disarmed.").

In light of the information Sylvester had at the time the door opened, as well as the tense, uncertain, and rapidly evolving situation Sylvester confronted when Scott opened the door wielding a gun, the Court concludes that in the totality of the circumstances – even if Scott's gun was pointed down – Sylvester's use of deadly force was reasonable and it declines to second-guess his split-second judgment. *See Penley,* 605 F.3d at 850; *Graham,* 490 U.S. at 396-97, 109 S.Ct. 1865. Therefore, even under the tragic circumstances of this case, the Court determines that Deputy Sylvester did not violate Scott's constitutional rights by using excessive force. The Personal Representatives have failed to show that Deputy Sylvester is not entitled to qualified immunity and summary judgment is therefore due to be granted in Sylvester's favor on Count I.

ii. <u>Was the right clearly established?</u>

Even if the Court found that Sylvester violated Scott's constitutional rights under the Fourth Amendment by using excessive force, Sylvester would be entitled to qualified immunity because he violated no clearly established right.

The Supreme Court has instructed that "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "At its core, the question is one of fair notice: 'If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.'" *Terrell v. Smith,* 668 F.3d 1244, 1255 (11th Cir. 2012) (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151). "[T]he purpose of the qualified immunity doctrine is to give meaning to the proposition that '[g]overnment officials are not required to err on the side of caution' when it comes to avoiding constitutional violations." *See Crosby,* 394 F.3d at 1334 (quoting *Marsh v. Butler County,* 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc)) (second alteration in original). Therefore, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *accord Bashir v. Rockdale County,* 445 F.3d 1323, 1327 (11th Cir. 2006).

Sylvester is entitled to qualified immunity unless his "supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." *Pace v. Capobianco,* 283 F.3d 1275, 1282 (11th Cir. 2002); *Morris v. Town of Lexington Alabama,* 748 F.3d 1316, 1322 (11th Cir. 2014) ("The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [police officer] that his conduct was unlawful in the situation he confronted." (citation omitted) (emphasis and alteration in original)).

A plaintiff may demonstrate that a constitutional right is clearly established in three ways:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.

*Terrell*, 668 F.3d at 1255 (internal citations, alterations and quotations omitted). In determining whether a right is clearly established, the Court looks to the precedent of the Supreme Court of the United States, of the Eleventh Circuit Court of Appeals, and of the Florida Supreme Court. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

Both sides give short shrift to this part of the analysis. The Personal Representatives appear to concede that a materially similar case has not been decided (*see* Doc. No. 52 at p. 7); instead, they direct the Court to the second and third methods mentioned above to demonstrate a clearly established right. First, the Personal Representatives argue that "Scott's right not to be shot and killed in his own home, when he is committing no crime and posing no threat to others, is a right that has been 'clearly established' from time in memorial [sic]." (*Id.*) (citing *Hudson*, 547 U.S. at 602-03, 126 S.Ct. 2159 ("As to the basic right in question, privacy and security in the home are central to the Fourth Amendment's guarantees as explained in our decisions and as understood since the beginnings of the Republic") (Kennedy, J., concurring in part and concurring in the judgment)). Second, the Personal Representatives also cursorily implicate the third method of demonstrating that a right is clearly established by citing to, but not arguing in any way, *Lee v. Ferraro*, 284 F.3d 1188 (11th. Cir. 2002). In *Lee*, the Eleventh Circuit stated that

> [b]ecause identifying factually similar cases may be difficult in the excessive force context, we have recognized a narrow exception also allowing parties to show that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily

> apparent to the official, notwithstanding the lack of case law.

*Id.* at 1198-99 (citation and internal quotation omitted).

The Personal Representatives' arguments, or rather, citations, completely overlook the most critical fact in this case: Scott answered the door to Apartment 114 holding a gun in his hand. While Scott may have been lawfully entitled to do so, Sylvester's response to the rapidly escalating situation in using deadly force did not violate a clearly established right. The Personal Representatives' argument that "Scott's right not to be shot and killed in his own home, when he is committing no crime and posing no threat to others" is directly contradicted by (1) the fact that Scott opened the door wielding a gun and (2) Plaintiffs' concession that Scott posed a danger to Sylvester and the other officers. (*See* Doc. No. 58 at p. 3). As to the third exception, the Eleventh Circuit requires extreme and outrageous facts where the facts of the case are "so far beyond the hazy border between excessive and acceptable force [that every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (concluding law was clearly established and force was "clearly-excessive-even-in-absence-of-case-law" when officer released police dog to attack plaintiff who was lying on the ground, did not pose a threat to officers or to anyone else, and was not attempting to flee or resist arrest); *see also Slicker v. Jackson,* 215 F.3d 1225, 1233 (11th Cir. 2000) (concluding, without case law on point, that the evidence, if credited, suggested "the officers used excessive force in beating Slicker even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way"). The facts of this case, even taken in the light most favorable to the Personal Representatives, do not fall "so far beyond" that hazy border and into this category.

As the Eleventh Circuit has made clear, the purpose of qualified immunity is to "give meaning to the proposition that '[g]overnment officials are not required to err on the side of caution' when it comes to avoiding constitutional violations." *Crosby,* 394 F.3d at 1334 (quoting *Marsh,* 268 F.3d at 1030 n.8) (alteration in original). This is particularly true in this case where Sylvester's inaction could have proven fatal to him or his fellow officers. The Personal Representatives failed to make a showing that Sylvester's actions would "inevitably lead every reasonable officer in [Sylvester's] position to conclude the force was unlawful." *Lee,* 284 F.3d at 1198 (quotation omitted). Taking all the facts and inferences in favor of the Personal Representatives, an objectively reasonable officer in Deputy Sylvester's position could have believed that he was entitled to use deadly force in the situation Deputy Sylvester confronted when the door opened to Apartment 114. Therefore, even if Sylvester erred in using excessive force against Scott, he was not so "plainly incompetent" as to be denied qualified immunity. *Malley v. Briggs,* 475 U.S. at 341, 106 S.Ct. 1092; *accord Bashir,* 445 F.3d at 1327. In the alternative, the second prong of the qualified immunity analysis also resolves in Sylvester's favor and summary judgment is still due to be granted in his favor on Count I.

### C. *Counts III and IV: The Personal Representatives Against Sylvester and Borders for Wrongful Death Under Florida Law*

Defendants also move for summary judgment on the Personal Representatives' state law claims. Although not completely clear from the parties' filings, Count III appears to be based on a claim of excessive force. However, the Personal Representatives also state Borders should be held liable under count IV for "Sylvester's negligence in not maintaining appropriate firearm discipline." (Doc. No. 52 at p. 15). Defendants argue in response that no authority is cited for the Personal Representatives' contention, which Defendants claim does not appear to be different

from a claim for excessive force. (Doc. No. 55 at p. 9). Defendants also complain that the Personal Representatives made no such claim in their Amended Complaint. (*Id.*). Out of an abundance of caution, the Court broadly construes these claims.

"Florida's Wrongful Death Act allows for recovery when the death of a person is caused by, *inter alia,* negligence or a 'wrongful act,' which includes the use of excessive force by a police officer." *Vaughn v. City Orlando*, No. 6:07-cv-1695-Orl-19GJK, 2009 WL 3241801, at *8 (M.D. Fla. Sept. 29, 2009) (Fawsett, J.) (citing *Kimbrough*, 2006 WL 3335066, at *8), *aff'd* 413 F. App'x 175 (11th Cir. 2011). Although Florida's Wrongful Death Act allows for recovery where the death is caused by negligence, when a plaintiff's allegations concern excessive force, the liability must arise from intentional torts. *See id.* ("Any liability under state law attributed to [the officer] for the use of excessive force must arise from the intentional tort of battery, not negligence." (citing *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA 1996))). "[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort." *Sanders*, 672 So. 2d at 48.

However, Florida also recognizes a cause of action for "the negligent handling of a firearm and the negligent decision to use a firearm separate and distinct from an excessive force claim." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (citing *Sanders*, 672 So. 2d at 48). "Both a claim for battery arising from excessive force and a claim for the negligent handling of a firearm turn on whether the amount of force used was reasonable under the circumstances." *Vaughn*, 2009 WL 3241801, at *8 (citing *Sanders*, 672 So. 2d at 48 ("Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer reasonably believes the force to be necessary to defend himself or another from bodily harm while making the arrest.") (internal quotations omitted)). The Court previously found that

Sylvester reasonably used deadly force and therefore summary judgment is due to be granted in Sylvester's favor on Count III.

As to Count IV against Sheriff Borders, Florida Law, unlike § 1983, allows a plaintiff to recover against a municipality for the tortious acts of its employees based upon a theory of *respondeat superior*. *Brown v. City of Clewiston*, 848 F.2d 1534, 1543 n.18 (11th Cir. 1988); *see* Fla. Stat. § 768.28. However, "[t]o prevail on a theory of vicarious liability against the City under Fla. Stat. § 768.28, [a plaintiff] ha[s] to show liability on the part of . . . the City's employee." *Laster v. City of Tampa Police Dep't*, No. 14-11034, 2014 WL 4116474, at *3 (11th Cir. Aug. 22, 2014) (citing *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1500-01 (11th Cir. 1990)). In light of the Court's previous findings, the Personal Representatives' wrongful death claim against the Sheriff is foreclosed and Borders is entitled to summary judgment on Count IV.

## IV. <u>CONCLUSION</u>

By any measure, this is a tragic case. The Court sympathizes with Plaintiffs' loss. The Court also understands the sentiment held by some in the community who believe that an innocent person who answered a late-night knock at his door was needlessly killed by the police. But Andrew Scott made a fateful decision that night: he chose to answer his door with a gun in his hand. That changed everything. That is the one thing that – more than anything else – led to this tragedy.

Those who view the actions of Deputy Sylvester as wrong may be tempted to invoke the ancient legal maxim, "Where there's a wrong, there's a remedy." However, the civil rights statutes that afford relief for police misconduct are not that simple. The appellate courts have held time and time again that there are strict legal requirements that must be met before an

officer or his employing agency may be held liable in damages. An individual officer cannot be held liable unless the law he has violated was clearly established. The policy reason underpinning this rule is well-settled: to allow government officials to carry out their discretionary duties without fear of personal liability. When it comes to avoiding constitutional violations, and amidst uncertainty, government officials are not required to err on the side of caution. Further, the officer's employing agency can be held liable only if an underlying constitutional violation occurred.

None of these requirements have been met in the present case. This Court is duty-bound by constitutional oath to apply the law, regardless of sympathy or prejudice. It has done just that here.

Therefore, based on the foregoing, it is **ORDERED** as follows:

1. Plaintiffs Amy Young and John Scott's, co-personal representatives of Andrew Scott's estate, Motion for Partial Summary Judgment, filed on May 1, 2014 (Doc. No. 35), is **DENIED**.
2. Defendants Gary S. Borders and Richard Sylvester's Motion for Summary Judgment, filed on May 1, 2014 (Doc. No. 50) is **GRANTED**.
3. The Clerk is **DIRECTED** to enter Final Judgment in favor of Defendants and against Plaintiffs.
4. All other pending motions are **DENIED** as moot.
5. The Clerk is **DIRECTED TO CLOSE** this case.

**DONE** and **ORDERED** in Orlando, Florida on September 18, 2014.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties