UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Docket No. 5:13-cv-113-Oc-22PRL

. . . . . . . . . . . . . .
AMY YOUNG, JOHN SCOTT and       :
MIRANDA MAUCK,                  :              Orlando, Florida
                                :
        Plaintiff               :              August 1, 2014
                                :              9:30 a.m.
           v.                   :
                                :
GARY S. BORDERS and RICHARD     :
SYLVESTER                       :
                                :
        Defendants              :
. . . . . . . . . . . . . .


    TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
      BEFORE THE HONORABLE ANNE C. CONWAY
          UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiff:  Stephen J. Calvacca
                    Jason J. Recksiedler


For the Defendant:  John M. Green, Jr.


Court Reporter:     Sandra K. Tremel, RMR/CRR
                    407-245-3110

Proceedings recorded by mechanical stenography, transcript

produced by computer-aided transcription.

P R O C E E D I N G S

1

2        THE COURT:  Case number 2013-113, Amy Young, John

3   Scott and Miranda Mauck v. Gary Borders and Richard

4   Sylvester.

5        Could we have appearances, please?

6        MR. CALVACCA:  For the plaintiffs, Steve Calvacca

7   and Jason Recksiedler of the NeJame law firm.

8        MR. GREEN:  For defendants, John Green from Ocala.

9        THE COURT:  All right.  We have 30 minutes for

10  this hearing, so divide it up equally.  Who wants to start?

11  You both have motions.  Plaintiff can start.

12        MR. CALVACCA:  Thank you, Judge.

13        About 12 years, Your Honor --

14        THE COURT:  Yes, it's been awhile.

15        MR. CALVACCA:  Good to see you.

16        THE COURT:  You don't look a day older.

17        MR. CALVACCA:  Thank you very much, and you're

18  looking very good, Judge.  Good to be back in Orlando.  Been

19  out of state for a while.

20        This is a very interesting case, a very tragic case.  A

21  man --

22        THE COURT:  Well, you can skip the facts.  I'm

23  very familiar with the facts.

24        MR. CALVACCA:  Where -- do you have any --

25        THE COURT:  You know, obviously the two issues are

the excessive force, whether the officer was reasonable in
his actions and whether or not the sheriff has vicarious
liability or municipal liability in this case.  So you
should address those two.  I'm more concerned with the legal
issues based on the facts because to the extent that the
facts are disputed, that precludes summary judgment.

MR. CALVACCA:  I understand.  And let me
understand the timeframe.  We have a total of 30 minutes for
both functions or 30 minutes for each?

THE COURT:  Total.

MR. CALVACCA:  Oh, all right.

THE COURT:  We're out of here at 10:00.

MR. CALVACCA:  Do you want me to --

THE COURT:  I want you to do whatever you want
knowing what I'm concerned with.

MR. CALVACCA:  Can I reserve five minutes?

THE COURT:  Yes.

MR. CALVACCA:  Thank you.

And I'll respond to his motion in the course of
making -- arguing for my motion.

THE COURT:  That's fine.

MR. CALVACCA:  Well, first of all, clearly there's
a dispute of facts on whether or not the decedent had his
weapon pointed at the officer at the time the officer fired
his first shot.  Officer Sylvester is the only one that was

1   able to say that the weapon was pointed at him.  The

2   girlfriend of the decedent, Ms. Mauck, testified the weapon

3   was down by the side of Mr. Scott and was not in a

4   threatening position.  So that I think is a --

5               THE COURT:  Is that a material dispute?

6               MR. CALVACCA:  I believe it is.

7               THE COURT:  So it's your position that if the gun

8   had been at the side that the officer had no -- that the

9   shooting wasn't justified?

10              MR. CALVACCA:  Correct.  And that's not only my

11  position, that's the position of the defense criminologist

12  and it's also the position of the deputy himself who said

13  that had --

14              THE COURT:  I didn't read his testimony quite that

15  way, but --

16              MR. CALVACCA:  Well, I thought he said that, first

17  of all, it was not unusual to expect someone at that time of

18  night with the banging on the door to answer the door with a

19  weapon in his hand, especially when the individual was not

20  told that it's the police outside.  It was a very

21  frightening experience for the two occupants.  And if in

22  fact the weapon was down and the officer overreacted or

23  panicked, which is a very likely scenario, then I think it

24  would be a liability because of objectively what he did was

25  not reasonable.  He basically shot into the home of an

individual whose identity he did not know, who was not a

suspect in any criminal activity that night, had no

involvement or awareness of the facts that brought the

officers to that neighborhood, and he shot into that home

not once but repeatedly, six times.  The fatal shot was

fired while Mr. Scott was in retreat and that comes from the

defense medical expert, Dr. Sperry.  The first shot that hit

Mr. Scott was not the fatal shot.  It was the second shot,

when the second shot hit Mr. Scott and his -- at that point

in time was headed back into the apartment with his gun arm,

if you will, his gun hand pointed away from the officer.

Given the rapidity with which events unfolded, and it's all

a split second, it's clear that Mr. Scott did not realize

who was on the other side of the door.  This fact was

admitted by the defense criminologist.

So what we have -- we don't have any intervening or

superseding misconduct by Mr. Scott that would attenuate

liability.  What we -- unlike what happened here, we can not

just look at the split second when that door opened.  We

have to look at how the officers conducted themselves and on

that there's no dispute of facts.  Clearly there was a

constructive entry into the house with a show of force, four

police officers with their guns out at the ready.

THE COURT:  All right.  There is a dispute as to

how loud the knock was.  Is that material?

MR. CALVACCA:  I think that's material, but I
don't think it's a genuine dispute, Your Honor, because,
first of all, one of the deputies admitted it was loud.  Ms.
Mauck said was it loud, frightening.  Two neutral witnesses
with no relation to the parties standing 200 feet away said
it was obnoxious, it was scary, it was -- and one witness
described it was a knock that could not be denied.  So I
think there's no question that the knock was very loud.  In
fact, it woke up a neighbor in the adjoining apartment.
That I think puts people in 114, my people, in fear.  Home
invasion is not uncommon in Florida, unfortunately.  As was
his right and as Sheriff Borders admitted in deposition,
Mr. Scott had a right to answer the door with his weapon.
The question is was the weapon pointed at the officer or was
it down?

Even if -- let's get back to agency liability for a
second.  Even if it was pointed at the officer, it was done
momentarily, distinctively without any knowledge on the part
of Mr. Scott that he was pointing the weapon at an officer.
In fact, the officer gave inconsistent testimony about
exactly what he saw.  When he was first questioned by FDLE
he said he looked at Mr. Scott.  Mr. Scott looked at him.
In deposition he said, now, I never saw Mr. Scott's face
until after I fired the first time.  I was staring into a
barrel of the gun.  I saw the rust, I saw the discoloration,

1    I saw the riflings.

2        Their own medical expert forensically said that was an

3    impossible observation to make given the distance of the

4    weapon from Deputy Sylvester.

5        So we have a very tenuous story.  The only witness who

6    puts the gun in his direction is Deputy Sylvester.  Ms.

7    Mauck said it was down.  That's a question of fact that has

8    to be resolved against the movant.  And therefore their

9    request for summary judgment on the individual officer

10   liability counts has to be denied.

11       But when we talk about agency liability, we have a

12   different set of facts.  First of all, there's municipal

13   liability here for two reasons.  Number one, there

14   apparently was a custom or practice, if not written policy,

15   that permitted officers to have these knock and talk

16   situations without ever having to announce their purpose or

17   their identity.  So it's one thing to walk up to someone's

18   house at 12:00 in the afternoon and politely knock and talk

19   about something.  It's another thing to come in at 2 in the

20   morning and bang and pound, scare the bejusus out of these

21   people and not expect what Justice Scalia called the

22   unintended consequences of an occupant acting in supposed

23   self-defense.  That's the whole purpose of a knock

24   requirement.

25       In Hudson v. Michigan, while the Court denied

1    suppression of the evidence, they said the remedy for these

2    no announcement situations are civil suits under 1983 which

3    is exactly what we did here.

4          THE COURT:  So you're -- the policy that or custom

5    that you're claiming is unconstitutional in violation of

6    1983, both, is the knock and talk in the middle of the

7    night?

8          MR. CALVACCA:  In the middle of the night with

9    guns drawn and a loud pounding on the door.  I mean, if it

10   was done differently, I don't think there would be

11   necessarily an obligation to announce.

12        But in looking at the objective reasonableness what

13   this officer did, we have to weigh the totality of the

14   circumstances.  There's no question that these people were

15   frightened and answered the door like many other people

16   would have.  Why the police didn't announce themselves is a

17   mystery to me.  Had they announced themselves, this never

18   would have happened.  In fact, that's the first thing that

19   Ms. Mauck said, when the police came into the room, why

20   didn't you guys tell us you were police.  Andrew never would

21   have taken his weapon out.  He's had these situations happen

22   to him before.  They resolved it themselves peacefully with

23   neighbors knocking on a wrong door at 3 in the morning.  But

24   this was a very aggressive knock.  The police basically had

25   seized the house.

Under the doctrine of constructive entry, which I think goes back to Payton vs. New York, you -- you cannot induce by coercive technique or tactics an occupant to answer the door when you don't have a warrant.  And he had no warrant, they had no probable cause, the had no reasonable suspicion, they had no exigent circumstance.  This was all about catching a motorcycle operator who got away from the deputy 20 minutes earlier that night and he was pursuing a traffic violator, essentially.  There was some suggestion that he might be the same motorcycle fellow involved in an incident in Leesburg, but there's no way they could make that connection.  There was no description of the biker or the operator.

So this was all about getting someone who's speeding away from a police officer and resulted in the death of an innocent homeowner.  And if that's not a violation of bedrock principle of the Fourth Amendment, what is?

In Hudson v Michigan, both Justice Scalia writing for the Court and Justice Kennedy writing his own separate opinion expressed the importance of the sanctity of the home.  Well, that principal was thrown out the window a long with this man's life by reckless conduct by Deputy Sylvester which reflected the custom and practice of the agency and furthermore would shut our borders specifically endorsed. And the doctrine of ratification is well known under Monell

vs. The Department of Social Services of New York City.

That an agency can become liable under 1983 if it adopts the

misconduct of its agents or employees.

So it's not question of vicarious liability per se

because that doesn't exist, we know that. There has to be a

custom or policy or some ratification which makes the

actions of an individual the responsibility of the agents.

So clearly --

THE COURT: You're getting into your --

MR. CALVACCA: Clearly there's liability and we

think under at least count two there should be summary

judgment granted in favor of the plaintiff. Thank you.

MR. GREEN: May it please the Court, the issues in

this case are fairly simple. The officer was chasing at a

high speed a motorcycle. He learned that the operator of

the motorcycle was believed to have been armed. The

motorcycle was found. They looked for the address of the

owner of the motorcycle, found the address. It was in a

city other than where they were. There was a indication

that lights were on and an apartment in front of where the

motorcycle was. The officer walked up to talk to the

occupant of that address not knowing who was inside, not

knowing if the owner or operator of the motorcycle was

inside, but wanting to find out the facts of this, of the

motorcycle being there. As they walked forward they were

1   reminded again that the motorcycle operator was known to be

2   armed.  Officer Sylvester stood to the left of the opening.

3   They knocked on the door.  On the third time that they

4   knocked, the door opened, and he says I was looking down the

5   barrel of a gun.  He immediately reacted and started firing

6   at the person holding the gun.

7        The issue that we have here is, first of all, is there

8   an excessive force claim violation of the Fourth Amendment,

9   is there a requirement that they announce themselves, and

10  then we have the issue of ratification.

11       On the issue of knock and announce or knock and talk

12  there are a number of cases that say if you're going to go

13  ahead and barge into a person's home either with an arrest

14  warrant or otherwise, search warrant, that you got to go

15  ahead and announce yourself before going in.  That was not

16  the intent of these officers and there's no evidence that

17  there was intent.  They did not know who was inside that

18  apartment.  They had suspicions only.

19       So we then get to what they indicated their motive was

20  and that was to have the person in there come out so they

21  could talk to him.  As they have indicated the person did

22  not have to come in -- come out, he could have looked out

23  the window to see who was there, but he did not have the

24  right to open the door and point the weapon at the officer.

25            THE COURT:  Were they all in uniform?

1        MR. GREEN:  They were all in uniform or Officer

2   Sylvester had a SWAT type outfit on, but clearly labeled as

3   sheriff.  They were not in plain clothes and there was clear

4   identification all the way through that they were the law

5   enforcement officers.

6        The case law that we've been talking about is knock and

7   talk.  There is nothing in the constitutional

8   interpretations that says that you've got to announce

9   yourself in those situations if that is your intent, which

10  all of the evidence indicates was the situation here.

11       So from the knock and announce, knock and talk

12  constitutionally qualified immunity would exist if worse and

13  there's no violation of the Constitution at best where they

14  walk into the door and attempt to talk.

15       With that you get to the excessive force claim and the

16  cases in that area are clear.  The Graham Garner case which

17  the Court is aware of says objective reasonableness is the

18  keystone and that everything has to be judged by the

19  perspective of a reasonable officer on the scene and not

20  20-20 hindsight.

21       The Tennessee Garner case stands for the police not

22  required to make an impossible split second evaluation of

23  unknowable facts.  And then the cases that I think are most

24  appropriate to this factual situation, we've got the O'Neal

25  DeKalb County case which stands for the fact that

reasonableness under the Fourth Amendment is for the Court.
It is not for the jury to consider. And, more importantly,
the John Baptiste vs. Gutierrez which is the 11th Circuit
case in which an officer received a report to be on alert
two black men suspected of committing burglary and robbery,
high speed chase, the officer saw a suspect holding a gun
eight to 10 feet away and shot 14 bullets with eight
entering the suspect. And in that the 11th said the law
does not require officers in a tense and dangerous situation
to wait until the moment a suspect uses the weapon to stop
the suspect. The officer is entitled to --

THE COURT: So you're saying just seeing -- any
time he sees a gun he can fire?

MR. GREEN: Under the circumstances that he has
reasonable belief that he is in danger. Obviously if you
see somebody just walk down the public street he's got a gun
in his hand but there's no indication that he's doing
anything wrong or a danger to anybody, he does not have a
right to shoot in that case. But here from the officer as
perspective he knows --

THE COURT: Even if the gun is pointed down?

MR. GREEN: I think that depends on the
circumstances. That's not the case here.

THE COURT: Well, then isn't that a jury question?

MR. GREEN: Jury question would not be whether the

gun is pointed down or at the officer.  We look at it from

the perspective of the officer.  He saw at the moment he

looked at it, the gun was pointed at him, and he reacted at

that particular point.  Whether it was down or not, it is

based upon his knowledge and his perspective, not the

perspective of the woman who gave three various stories of

what happened and may or may not have seen the events about

which she was talking.

But from the officer's perspective, all of them, you

have a dangerous hostile situation that may be inside and at

the point that he opens the door and has the gun pointed in

the direction of the officer, which the testimony is

indicated, the officer yells "gun" and then he fires.  All

the witnesses all hear, even the two independent witnesses,

the officer yell "gun," and then we have the discharge of

the firearms.

THE COURT:  Did any of other officers see the gun?

MR. GREEN:  Pardon?

THE COURT:  Did the other officers see the gun?

MR. GREEN:  They did not.  They heard the yell of

he's get a gun but they did not from their vantage point,

their views or blocked or their attention was diverted to

something else, and they did not see that.

THE COURT:  What does the expert say about whether

the decedent could have seen or would have seen the officer

1    who shot him?  Has anybody -- obviously we can't find out

2    from the decedent.

3                MR. GREEN:  There is --

4                THE COURT:  And there's testimony as to what Ms.

5    Mauck said.

6                MR. GREEN:  There is testimony as to the position

7    at different points in time when the bullet struck him, but

8    as far as the exact position of him, the position of the

9    gun, there is no testimony as to -- by anyone other than the

10   officer as to what he is perceiving when the door opens.

11               THE COURT:  So we don't know if he could see the

12   officer who shot him or any of the other officers?

13               MR. GREEN:  Well, there is -- when the door opens

14   there's no question that he had a clear view at the officer.

15               THE COURT:  Okay.  So he opened the door all the

16   way?

17               MR. GREEN:  No, ma'am.  The door --

18               THE COURT:  That's how I understood, that he was

19   kind of behind the door.

20               MR. GREEN:  He was -- the door opens, the doorknob

21   would be at this position with the door hinges over here, he

22   grabs the doorknob with his right hand.  He's got the

23   firearm in his left hand.  He opens the door and that is the

24   point that the officer sees him.  He is shot.  What is

25   believed to be the first shot goes in the arm and then to

the chest. And it did not come between anything before going in him. So you would have to assume that he had at least a straight view in the direction of the pistol because he would be facing the pistol at that particular point. So that would be the only elements that -- other than the officer as to what he was seeing at the time the door opened other than the fact he is yelling to every one "gun." And then he fires.

The officer under Baptiste is entitled to continue his use of force until fully secured. He's entitled to qualified immunity if he reasonably could believe probable cause existed in light of the information he possessed even if that belief is mistaken and it's judged objectively, and he's shielded from liability unless application would inevitably lead every reasonable officer to a position to conclude that it was unlawful.

And the perspective crucial to the analysis, the only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded and the officer's not required to wait and hope for the best.

And then the next case I think is on point is the Carr Tatangelo case where they quote from the Fourth Circuit. And at that point the officer heard someone yell "he's got a gun,' immediately turns around, and shot the suspect, could not see whether he had a gun or not. He went ahead and

fired the shot and they held the use of force was

reasonable.  For all the officer knew the hesitation

involved in giving a warning readily caused such a warning

to be his last.  And there is no influxible rule to avoid

civil liability.  He must always warn before firing.  They

say that is not a requirement particularly where the warning

might cause the officer his life.

THE COURT:  So talk to me about agency liability.

MR. GREEN:  Agency liability would have to be on

two parts.  One would be whether or not the agency actually

had an unconstitutional policy.  There is no question that

they --

THE COURT:  And that policy is knock and talk in

the middle of the night?

MR. GREEN:  The policy is that the officer has use

of discretion.  It is not that you -- when you go to the

door you do not announce yourself.  It's a situational

requirement.  You don't have to.  It's up to the judgment of

the officer as to whether you announce yourself.

THE COURT:  Based on the circumstances?

MR. GREEN:  Based on the circumstances if you're

intent is not to go in.

So from the standpoint of agency policy, that is the

only policy.  As far as use of force the officer under

policy is entitled to use such force as is necessary and in

order to protect himself and others from deadly force, he
can use deadly force.

We then get into very briefly the issue of ratification
which seems to be coming up in cases.  As the Court is aware
under Monell there would have to be direct agency liability.
Essentially if the Court were to -- the sheriff were to
ratify the actions then there could be agency liability.  As
to the ratification concept in this particular case, the
only area that the sheriff indicated they agreed with is
that its discretionary as to whether to announce if you're
not going in to make a search or to break into the house on
the other grounds.

The question then would come up of -- Judge Presnell
has been cited recently on his decision on Kimbrough Cocoa
case on whether or not there could be liability as a result
of not doing some type of investigation.  And the key seems
to be in that case whether or not other than the Florida
Department of Law Enforcement was there an investigation.
In our case the FDLE did their investigation but there was
also an administrative review that was done which went
through the actions and concluded that the actions of Deputy
Sylvester were found to be within the statutory authority
given to law enforcement officers for the use of force
consistent with agency policy and also consistent with use
of force training.

So we don't get into the ratification argument. But Judge Presnell in his Kimbrough case was addressed in oral -- most recently the case that Judge Hodges oversaw because in this case it was an internal review. There was an external review and state attorney review and all of them indicated that the officer was within his rights to go ahead and fire.

This is an unfortunate situation. But looking at it from the perspective that we have to look at it and evaluate whether or not it was a violation of the Constitution or state law, from the officer's standpoint, he had been advised by dispatch that the person that had fled at a high rate of speed was armed. As they were walking up they were reminded again just keep in mind that he was armed. There was not an intent to go into the house. They did not know who was in the house. They did not know that the operator was in the house. They didn't know that the owner of the motorcycle was the operator. They were there to get information.

Choices existed on the part of Mr. Scott. He made the wrong choice in going to retrieve a weapon, and the actions of the officer were appropriate or justified. They were constitutional. They were within his rights under qualified immunity and we respectfully suggest that both the sheriff and the officer are entitled to summary judgment.

1        THE COURT:  All right.  Mr. Calvacca.

2        MR. CALVACCA:  Thank you, Judge.

3     Judge, how is any of this objectively reasonable when

4  an innocent man who did nothing wrong that night is shot in

5  the doorway of his house merely holding a weapon at his

6  side, because that's the plaintiff's version of facts, which

7  you must accept.  He's shot by an officer for no good reason

8  at all.  It makes no sense.  We have to look at the totality

9  of circumstances.  The way they took that house down was

10  wrong.  I don't know what information they thought they had,

11  but if they thought that had probable cause they should have

12  gotten a warrant, there should have been a commander or

13  supervisor on the scene.  There was no exigent circumstances

14  that that traffic stop was -- pursuit was called off by the

15  a lieutenant.  Deputy Sylvester was hot headed and he was

16  not in hot pursuit.  And he took down that house without

17  giving any thought as to where that actual motorcycle

18  operator lived.  There was a number of available on the

19  management door 24/7 they could have called.  There were

20  occupants -- there were neighbors walking about, milling

21  about.  They could have found out where Mr. Brown lived.

22  Instead they just acted with no judgment and certainly

23  wasn't reasonable.

24     Counsel cites the Baptiste case which is entirely

25  different.  They had two gentlemen armed, fleeing from a

robbery or burglary and in the course of the pursuit the
officer believes that there's a gun in the hand of one of
the individuals pointed at him and he shoots.  It turns out
he may have been mistaken.  But that's an entirely different
situation than shooting an innocent homeowner in his house.
That's not reasonable.

    In terms of agency liability, there's no question it
was ratification here and there was no question --

        THE COURT:  What was the ratification?

        MR. CALVACCA:  Sheriff Borders commended Sylvester
for his actions, he stood behind him 100 percent, no
criticism, no change of policy, no internal investigation
all the things that were missing in Kimbrough.

        THE COURT:  There was no internal investigation?

        MR. CALVACCA:  Correct.  Nothing meaningful.

        THE COURT:  Mr. Green said there was.

        MR. CALVACCA:  I don't believe -- there was the
FDLE investigation.

        MR. GREEN:  I can give it to the Court if the
Court wants it.

        MR. CALVACCA:  But there was no policy change,
there -- if -- if -- if the investigation --

        THE COURT:  That's a different issue, if there's
no policy change, but not having any kind of investigation
at all --

1          MR. CALVACCA:  Well, Borders's testimony was that

2   he was relying on the FDLE investigation.  So whatever

3   investigation there was --

4          THE COURT:  Share with Mr. Calvacca.

5          MR. CALVACCA:  This is it.  Two pages.  Hardly an

6   investigation.

7          MR. GREEN:  That's the results of the

8   investigation.

9          MR. CALVACCA:  This hardly meets the test of

10  Kimbrough or Sabado.

11      In any event the officer was exonerated, no criticism,

12  no change in policy.  How can a sheriff, an elected

13  official, say this was a good night for us?  An innocent

14  homeowner was killed.  If it happened in Windermere or

15  Winter Park, if the boy were a law student or a medical

16  student, not a pizza delivery boy, there'd be an outcry.

17  There would be a change in policy.

18      There's no question but the de facto default position

19  of that agency is never to announce.  That's what all the

20  deputies that we depose said.

21      So leaving it to the discretion of the individual

22  officer resulted in never -- there never being an

23  announcement.  And in fact if that's the policy that each

24  officer can decide for himself, then Sylvester became the

25  final policy maker for that, and on that basis there's

1   municipal liability.

2       We think we should have summary judgment on count two.

3   Thank you.

4            THE COURT:  All right.  I'll get the out order as

5   soon as possible.

6            MR. GREEN:  Do you want this, Your Honor, for --

7            THE COURT:  No.

8       (Motion concluded at 10:00 a.m.)

9            C E R T I F I C A T E

10           I certify that the foregoing is a correct

11  transcript from the record of proceedings in the

12  above-entitled matter.

13

14  s\Sandra K. Tremel            October 20, 2014

15

16

17

18

19

20

21

22

23

24

25